134 Cal.Rptr.2d 420 (2003)
139 Cal.App.4th 39
James NAGEL et al., Plaintiffs and Respondents,
v.
TWIN LABORATORIES, INC., et al., Defendants and Appellants.
No. G030196.
Court of Appeal, Fourth District.
May 22, 2003.
*422 Leck & Associates, Robert B. Leek III, Bette A. Baker; Ulmer & Berne, Joseph P. Thomas and Rex A. Littrell for Defendants and Appellants.
Robinson, Calcagnie & Robinson, Sharon J. Arkin, Newport Beach; Andrews & Thornton, Anne Andrews and John C. Thornton, Long Beach, for Plaintiffs and Respondents.

*421 OPINION
FYBEL, J.
Twin Laboratories, Inc., manufactures and markets nutritional and dietary supplements, some of which contain ma huang, a botanical source of ephedra alkaloids. General Nutrition Corporation (GNC) and its franchisees sell these products.
James Nagel, on behalf of himself and all others similarly situated (collectively Nagel), sued Twin Laboratories, Inc. (apparently incorrectly named in the complaint as Twin Lab Corporation), GNC, and certain GNC franchisees for violations of California's unfair competition laws and the Consumer Legal Remedies Act. (For ease of reference, we will refer to all defendants collectively as Twin Labs.) Both Twin Labs' product labels and its Web site state that the ma huang extract in Twin Labs' product "Ripped Fuel" is "standardized for 6% ephedrine." Nagel claims this statement is false and misleading.
Twin Labs moved to strike the complaint pursuant to Code of Civil Procedure section 425.16 (section 425.16), commonly referred to as the anti-SLAPP (strategic lawsuit against public participation statute. The trial court found Twin Labs' labeling and advertising to be speech protected by section 425.16, but also found Nagel had established a probability he would prevail on the merits of his claims. Therefore, the trial court denied the motion to strike.
We affirm. Three recent opinions from the California Supreme CourtNavellier v. Sletten (2002) 29 Cal.4th 82, 124 Cal.Rptr.2d 530, 52 P.3d 703, City of Cotati v. Cashman (2002) 29 Cal.4th 69, 124 Cal. Rptr.2d 519, 52 P.3d 695, and Equilon Enterprises v. Consumer Cause, Inc. (2002) 29 Cal.4th 53, 124 Cal.Rptr.2d 507, 52 P.3d 685have clarified the scope and application of the anti-SLAPP statute. A cause of action is subject to a motion to strike if it "satisfies both prongs of the anti-SLAPP statutei.e., [it] arises from protected speech or petitioning and lacks even minimal merit." (Navellier v. Sletten, supra, 29 Cal.4th at p. 89, 124 Cal. Rptr.2d 530, 52 P.3d 703.)
With regard to the first prongwhether the cause of action arises from protected speechTwin Labs' product labels and Web site listing of the ingredients of its products are commercial speech, but are not immunized from a false advertising claim by virtue of the anti-SLAPP statute. The United States Supreme Court has long held commercial speech receives less protection than noncommercial speech. We conclude the list of a product's ingredients does not satisfy the first prong of section 425.16. Even if the first prong of the anti-SLAPP statute had been satisfied, Nagel provided sufficient admissible evidence *423 to show he had a probability of prevailing on the merits of his claims.

FACTS AND TRIAL COURT PROCEEDINGS
Twin Labs manufactures and markets dietary supplements containing ephedra alkaloids, which are obtained from the ma huang plant. Twin Labs markets several different products containing ephedra alkaloids, including Ripped Fuel. Ephedra alkaloids are used as stimulants or diet aids in the weight loss market. Ephedra has been allegedly linked to medical conditions causing serious illness and even death.
GNC and its franchisees advertise, market, distribute, and sell Ripped Fuel and other Twin Labs products containing ephedra alkaloids.
The labels on the bottles of Ripped Fuel state the ma huang extract is "standardized for 6% ephedrine." Twin Labs' Web site also contains this statement. Nagel contends the ephedrine in Ripped Fuel is not "standardized," at least not in the popularly understood use of the word. The results of tests conducted on Ripped Fuel appear to show the amount of ephedrine differs dramatically between lots.
Nagel sued Twin Labs for unfair competition, false advertising, and violation of the Consumer Legal Remedies Act (CLRA), contending the statements on the bottle labels and on Twin Labs' Web site regarding the amount of standardized ephedrine in Ripped Fuel were false and misleading.
Twin Labs filed a special motion to strike under section 425.16, contending its product labeling and advertising were protected free speech on a matter of public interest and Nagel could not prevail on his claims. Nagel opposed the motion, arguing because Twin Labs' advertising was false, it was not entitled to any protection and section 425.16 therefore did not apply. Nagel argued, alternatively, if the list of ingredients was protected by section 425.16, he had presented sufficient evidence to show he would prevail on his claims.
The trial court denied the motion to strike, finding Twin Labs' labeling and advertising were protected by section 425.16, but Nagel had successfully shown he would prevail on his claims. Twin Labs appealed. (Code Civ. Proc, §§ 425.16, subd. OX 904.1, subd. (a)(13).)

DISCUSSION

I.

Standard of Review
On appeal, we review de novo whether section 425.16 protects the subject speech and whether Nagel demonstrated a probability he would prevail on his claims. (Lam v. Ngo (2001) 91 Cal.App.4th 832, 845, 111 Cal.Rptr.2d 582.)

II.

Statutory Framework
Section 425.16 provides, in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) "As used in this section, `act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes ... any other conduct in furtherance of the *424 exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)[1]
In analyzing a section 425.16 motion, the trial court engages in a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (Navellier v. Sletten, supra, 29 Cal.4th 82, 88, 124 Cal.Rptr.2d 530, 52 P.3d 703.) The defendant meets this burden by showing the act underlying the plaintiffs cause of action fits within section 425.16. (Braun v. Chronicle Publishing Co. (1997) 52 Cal. App.4th 1036, 1043, 61 Cal.Rptr.2d 58.)
If the defendant meets this initial burden, the burden then shifts and the plaintiff must show a probability of prevailing on the claim. (Navellier v. Sletten, supra, 29 Cal.4th at p. 88, 124 Cal.Rptr.2d 530, 52 P.3d 703.) "`[T]he plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."'" (Id. at pp. 88-89, 124 Cal.Rptr.2d 530, 52 P.3d 703.) The plaintiff must make a prima facie showing of facts that would, if proven, support a judgment in the plaintiffs favor. (Wilson v. Parker, Covert & Chidester (2002) 28 Cal.4th 811, 821, 123 Cal.Rptr.2d 19, 50 P.3d 733; Walker v. Kiousis (2001) 93 Cal.App.4th 1432, 1439, 114 Cal.Rptr.2d 69; Lam v. Ngo, supra, 91 Cal.App.4th 832, 845, 111 Cal.Rptr.2d 582.) The plaintiff cannot rely on the allegations of the complaint alone, but must present admissible evidence. (Evans v. Unkow (1995) 38 Cal.App.4th 1490, 1497-1498, 45 Cal.Rptr.2d 624.) In ruling on a motion to strike, the trial court does not weigh the evidence or determine questions of credibility; instead the court accepts as true all of the evidence favorable to the plaintiff. (Kashian v. Harriman (2002) 98 Cal. App.4th 892, 906, 120 Cal.Rptr.2d 576.)
Here, the trial court determined Twin Labs' list of ingredients on its product labels and its Web site was protected by the anti-SLAPP statute because "[t]he complaint does allege speech on an issue of public interest (at least as defined by the court in DuPont Merck Pharmaceutical [Co. v. Superior Court (2000) 78 Cal. App.4th 562], [92 Cal.Rptr.2d 755])." As to the second prong of the analysis, the trial court found Nagel had met his burden of showing a probability of prevailing on the claims, stating: "[P]laintiff has established a probability that he will prevail in his claim that within the statutory period, defendants products were not standardized as marked and advertised, constituting a violation of the [unfair competition law] and CLRA."

III.

Does Section 4-25.16 Protect Twin Labs' List of Ingredients on Its Product Labels and Web Site?
Is the list of Ripped Fuel's ingredients, found on the product labels and on Twin Labs' Web site, speech in furtherance of Twin Labs'"right of petition or free speech under the United States or California Constitution in connection with a public issue" (§ 425.16, subd. (b)(1)) within the *425 meaning of section 425.16? We conclude it is not.
We start our analysis with the recognition that the list of ingredients on Twin Labs' labels and Web site constitutes commercial speech only. Twin Labs agrees, as it must, that the description of the ingredients in its products is commercial speech.
Commercial speech is entitled to protection, but the First Amendment to the United States Constitution "accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." (Bolger v. Youngs Drug Products Corp. (1983) 463 U.S. 60, 64-65, 103 S.Ct. 2875, 77 L.Ed.2d 469.) There are three reasons for the distinction between the protections given to commercial and noncommercial speech. First, it is easier to verify the truth of commercial speech, so governmental regulation is less likely to chill the dissemination of accurate and nondeceptive speech. (Va. Pharmacy Bd. v. Va. Consumer Council (1976) 425 U.S. 748, 771, fn. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346.) Second, because commercial speakers act from profit motives, commercial speech is less likely to be abandoned due to governmental regulation. (Ibid.) Third, because the government has the authority to regulate commercial transactions to prevent harm to the consumer, it similarly has the authority to regulate the speech connected to those transactions. (U. Liquormart, Inc. v. Rhode Island (1996) 517 U.S. 484, 499, 116 S.Ct. 1495, 134 L.Ed.2d 711; see also Illinois ex rel. Madigan v. Telemarketing Associates, Inc. (2003) 538 U.S. 600, 123 S.Ct. 1829, 1832, 155 L.Ed.2d 793 [state Attorney General could maintain fraud claim based on misleading representations in charitable fundraising].)
We analyze Twin Labs' anti-SLAPP motion in view of the purpose and language of section 425.16. To do so, we also rely on decisions by the United States Supreme Court, describing the protection afforded to commercial speech. What is the extent of protection under section 425.16 for Twin Labs' list of ingredients in its products? Political speech is at one end of the spectrum and is protected under the First Amendment and section 425.16. (National Endowment for the Arts v. Finley (1998) 524 U.S. 569, 603, 118 S.Ct. 2168, 141 L.Ed.2d 500.) We conclude a list of product ingredients on labels and a Web site is at the other end of the spectrum and is not protected speech under section 425.16. Twin Labs has not cited any case to us (and we have discovered none) in which a product label or other form of commercial speech that does nothing more than list the product's ingredients has received the protection of section 425.16.
Twin Labs argues its list of ingredients should be protected under section 425.16 because it is speech "in connection with a public issue." (§ 425.16, subd. (b)(1).) This argument fails for two reasons. First, the language "in connection with a public issue" modifies earlier language in the statute referring to the acts in furtherance of the constitutional right of free speech. The phrase cannot be read in isolation. Thus, Twin Labs' reliance on an argument that its list of product ingredients is immunized because it pertains to a public health issueweight managementfails.
Second, while matters of health and weight management are undeniably of interest to the public, it does not necessarily follow that all lists of ingredients on labels of food products or on the manufacturers' Web sites are fully protected from legal challenges by virtue of section 425.16. "Advertisers should not be permitted to immunize false or misleading product information *426 from government regulation simply by including references to public issues." (Bolger v. Youngs Drug Products Corp., supra, 463 U.S. at p. 68, 103 S.Ct. 2875.) Here, the list of Ripped Fuel's ingredients on the bottle labels and on Twin Labs' Web site was not participation in the public dialogue on weight management issues; the labeling on its face was designed to further Twin Labs' private interest of increasing sales for its products. (Ericsson GE Mobile Communications, Inc. v. C.S.I. Telecommunications Engineers (1996) 49 Cal.App.4th 1591, 1602-1603, 57 Cal. Rptr.2d 491.) Twin Labs' commercial speech was not made "in connection with a public issue" as that phrase is used in section 425.16. The anti-SLAPP statute does not require dismissal of Nagel's lawsuit.
The California Supreme Court's opinion in Kasky v. Nike, Inc. (2002) 27 Cal.4th 939, 119 Cal.Rptr.2d 296, 45 P.3d 243, (Nike), summarizes the United States Supreme Court's decisions comparing commercial and noncommercial speech, and analyzes what speech may be subjected to California's false advertising laws. Nike did not involve the anti-SLAPP statute. The speech at issue in Nike was a public debate over Nike's labor practices in foreign countries. News agencies reported workers in foreign factories where Nike's products are manufactured "were paid less than the applicable local minimum wage; required to work overtime; allowed and encouraged to work more overtime hours than applicable local law allowed; subjected to physical, verbal, and sexual abuse; and exposed to toxic chemicals, noise, heat, and dust without adequate safety equipment, in violation of applicable local occupational health and safety regulations." (Id. at p. 947, 119 Cal.Rptr.2d 296, 45 P.3d 243.)
To counter the negative publicity generated by these reports, Nike issued statements in press releases, in letters to newspapers, in a letter to university presidents and athletic directors, and in other forms of public relations materials. The materials stated the workers in Nike's foreign factories received a living wage, were paid more than the local minimum wage, received free meals and health care, and worked under conditions that complied with local laws regarding occupational health and safety. (Nike, supra, 27 Cal.4th at pp. 947-948, 119 Cal.Rptr.2d 296, 45 P.3d 243.) Nike also paid for full-page advertisements in major newspapers, detailing the findings of an investigation by former United Nations Ambassador Andrew Young, which found "no evidence of illegal or unsafe working conditions at Nike factories in China, Vietnam, and Indonesia." (Id. at p. 948, 119 Cal.Rptr.2d 296, 45 P.3d 243.)
Based on these statements and advertisements, Kasky sued Nike for false advertising and violation of the unfair competition law. The California Supreme Court, in a four-to-three vote, found the First Amendment did not protect Nike's speech from a false advertising claim. As we explain below, under either the analysis of the majority or dissenting opinions in Nike, Twin Labs' speech at issue in this case is not protected under the First Amendment.
The majority in Nike determined Nike's speech about the conditions of and labor practices in its foreign factories consisted of "factual statements about how Nike makes its products" (Nike, supra, 27 Cal.4th at p. 967, 119 Cal.Rptr.2d 296, 45 P.3d 243 (maj. opn. of Kennard, J.)), and therefore was "commercial speech that may be regulated to prevent consumer deception." (Id. at p. 969, 119 Cal.Rptr.2d 296, 45 P.3d 243.) Under the majority's *427 analysis, Twin Labs' statements about the ingredients in its products are commercial speech subject to false advertising challenges.
Two dissenting opinions disagreed with the majority's conclusion that Nike's speech was commercial speech only. Justice Chin, joined by Justice Baxter, cited United States Supreme Court decisions identifying commercial speech as speech that does no more than propose a commercial transaction. (Nike, supra, 27 Cal.4th at p. 974, 119 Cal.Rptr.2d 296, 45 P.3d 243 (dis. opn. of Chin, J.), citing Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 762, 96 S.Ct. 1817.) Justice Chin's dissenting opinion concluded Nike's speech went beyond proposing a commercial transaction: "It provided information vital to the public debate on international labor rights and reform." (Nike, supra, 27 Cal.4th at p. 974, 119 Cal.Rptr.2d 296, 45 P.3d 243 (dis. opn. of Chin, J.).) Therefore, the commercial speech and noncommercial speech were at least "`inextricably intertwined.'" (Id. at p. 975, 119 Cal. Rptr.2d 296, 45 P.3d 243 (dis. opn. of Chin, J.), quoting Riley v. National Federation of Blind (1988) 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669.) Because the two types of speech were "`inextricably intertwined,' " Justice Chin rejected the majority's parsing out of Nike's commercial speech from its noncommercial speech. (Nike, supra, 27 Cal.4th at p. 977, 119 Cal.Rptr.2d 296, 45 P.3d 243 (dis. opn. of Chin, J.).) Justice Brown agreed the speech at issue was protected because "the commercial elements of Nike's statements are `inextricably intertwined' with their noncommercial elements. [Citation.]" (Id at p. 980, 119 Cal.Rptr.2d 296, 45 P.3d 243 (dis. opn. of Brown, J.).) Here, in stark contrast, there are only commercial elements of speech and they are not "`inextricably intertwined'" with noncommercial elements.
Furthermore, there are additional material differences between Nike and this case, namely the purpose and timing of the speech at issue. As Justice Chin noted, Nike used its speech to "defend itself from the attacks in the media regarding its labor practices. (Nike, supra, 27 Cal.4th at p. 971, 119 Cal.Rptr.2d 296, 45 P.3d 243 (dis. opn. of Chin, J.).) Permitting criticism of a commercial enterprise, while denying that enterprise the ability to defend itself because it markets its business in the process, creates an unlevel playing field and ultimately will inhibit rather than promote vigorous and meaningful debate. (Ibid.) Here, Twin Labs was never defending itself from criticism; it was only listing the ingredients in its products.
In two cases, this division has addressed issues raised under the first prong of section 425.16 similar to those discussed in this opinion. First, in DuPont Merck Pharmaceutical Co. v. Superior Court (2000) 78 Cal.App.4th 562, 92 Cal.Rptr.2d 755 (DuPont), this court ordered the trial court to vacate its order denying the defendant's motion to strike. (Id. at p. 569, 92 Cal.Rptr.2d 755.) The trial court determined section 425.16 did not apply to the alleged violations of the unfair competition law and the CLRA, arising out of the defendant's alleged false statements in marketing its drug, Coumadin. (DuPont, supra, at p. 564, 92 Cal.Rptr.2d 755.) The defendant allegedly made false and misleading statements to the public through press releases, Internet bulletins, and public statements, and to doctors through marketing materials. The defendant also allegedly engaged in lobbying activities designed to delay the introduction of a generic version of Coumadin. (Id. at pp. 564-565, 92 Cal.Rptr.2d 755.)
This court concluded the alleged acts were protected by the defendant's free *428 speech rights (DuPont, supra, 78 Cal. App.4th at p. 566, 92 Cal.Rptr.2d 755), and were undertaken in connection with a public issue (id. at p. 567, 92 Cal.Rptr.2d 755). This court concluded the actions were therefore protected speech under section 425.16. (DuPont, supra, at p. 567, 92 Cal. Rptr.2d 755.) Based on the record before it, the court in DuPont did not reach the issue whether the plaintiffs would prevail on the merits. (Id. at p. 568, 92 Cal. Rptr.2d 755.)
In DuPont, the court found that because more than 1.8 million Americans had purchased Coumadin, and Coumadin prevents serious life-threatening illnesses such as stroke and pulmonary embolism, the issue raised by the defendant's statements was one of public interest. (DuPont, supra, 78 Cal.App.4th at p. 567, 92 Cal.Rptr.2d 755.) The number of consumers of products containing ephedrine is at least comparable. In its motion to strike, Twin Labs offered evidence that "over three billion servings of Ephedra products are consumed each year." Twin Labs alone produces over one million capsules containing the ma huang extract per day. Because Twin Labs mass produces ma huang capsules and weight management is a subject of public interest, DuPont is not distinguishable on the basis that speech regarding a widely ingested drug used to thin blood, such as Coumadin, is a matter of public interest, but speech regarding a widely ingested nonmedicinal product used to try to lose weight is not.
Nevertheless, the defendant's advertising in DuPont was inextricably intertwined with speech providing medical information to the consuming public and medical doctors, and with speech furthering its political lobbying activities. Here, the list of ingredients on the packaging of the product and on Twin Labs' Web site is not intertwined, much less inextricably so, with any noncommercial speech. Therefore, the result reached in DuPont is consistent with the one reached here.
Second, this court's recent decision in Consumer Justice Center v. Trimedica Internal, Inc., supra, 107 Cal.App.4th 595, 132 Cal.Rptr.2d 191, is also consistent with the foregoing analysis. The speech in that case consisted of the defendant's statement of the effect its product had on the human body, which this court determined was not protected by section 425.16. A description of what a product can do is comparable to a description of what a product contains; both are forms of product advertising and of commercial speech only. In Consumer Justice Center v. Trimedica Internat., Inc., as in this case, there was no contention the commercial speech was intertwined with noncommercial speech.

TV.

Did Nagel Establish a Probability He Would Prevail on His Claim?
Even if Twin Labs' list of product ingredients on labels and on its Web site was protected by section 425.16, we would still affirm the trial court's order denying the motion to strike because Nagel established a probability he would prevail on his claims. We begin by considering the elements of Nagel's claims so we may determine whether evidence offered by Nagel in opposition to the motion to strike is sufficient.
Nagel asserted three causes of action against Twin Labs: violations of the unfair competition law, Business and Professions Code section 17200; violations of the false advertising law, Business and Professions Code section 17500; and violations of the CLRA, Civil Code section 1770.
The unfair competition law prohibits any unlawful, unfair, deceptive or misleading business practice. (Cel-Tech *429 Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999) 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527; Prata v. Superior Court (2001) 91 Cal. App.4th 1128, 1144, 111 Cal.Rptr.2d 296.) "Section 17200 [of the Business and Professions Code] has been interpreted broadly to bar all ongoing wrongful business activity, including misleading advertising, in whatever context it presents itself." (Day v. AT T Corp. (1998) 63 Cal.App.4th 325, 332, 74 Cal.Rptr.2d 55.)
A claim for false advertising requires proof that the defendant, in connection with the sale of a product or service, made an untrue or misleading statement regarding the product or service. (Bus. & Prof.Code, § 17500.) Under Business and Professions Code section 17500, a statement can be true, yet still be misleading. (Day v. AT & T Corp., supra, 63 Cal. App.4th 325, 332-333, 74 Cal.Rptr.2d 55.)
Under the CLRA, a defendant may be liable for deceptive practices in the sale of goods or services to consumers including: representing the goods have ingredients they do not have; representing the goods are of a particular standard, quality or grade, if they are not; and advertising goods with the intent not to sell them as advertised. (Civ.Code, § 1770, subd. (a)(5), (7) & (9).)
Twin Labs represented on its Web site the ma huang extract in its Ripped Fuel product was "standardized for 6% ephedrine." The labels on the Ripped Fuel bottles also state the ma huang extract is "standardized for 6% ephedrine."
Test results attached to the declarations of Nagel's expert witnesses, Bill Gurley and Neil Spingarn, which were submitted in opposition to the motion to strike, showed the Ripped Fuel product actually contained widely divergent amounts of ephedrine, and the ma huang extract was not standardized for 6 percent ephredine. Nagel also submitted a report prepared by Gurley and two other scientists entitled "Content versus label claims in ephedracontaining dietary supplements," published in the American Journal of Health-System Pharmacists in May 2000.
Nagel also offered the deposition testimony of Twin Labs' head chemist, taken in two other actions. The chemist testified: the finished product of Ripped Fuel was tested 23 times over a three-year period; the term "standardized," when applied to an ingredient like ephedrine, means the product has been "concentrated or controlled to be a certain percentage of whatever the active might be"; Twin Labs had the capability to provide the actual percentage of ephedrine in a product, but did not do so, and instead lumped all the ephedra alkaloids together; and Twin Labs produced over one million capsules containing the ma huang extract per day.
The evidence offered by Nagel was sufficient to establish a probability he would prevail on the merits of his claims. Accepting all admissible evidence as true and indulging in every reasonable inference to be drawn from that evidence, the trial court properly found Twin Labs' statements were either false or likely to be misleading to a reasonable consumer. If the Ripped Fuel labels and the Twin Labs' Web site stated the product was "standardized for 6% ephedrine" but the actual amount of ephedrine varied dramatically, it could be inferred a reasonable consumer concerned about the amount of ephedrine in the product would likely be misled by Twin Labs' advertising. The probability of proving all the elements of Nagel's claims was therefore established.
Twin Labs countered Nagel's prima facie showing with its own evidence. "In deciding the question of potential merit, the trial court considers the pleadings *430 and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not weigh the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiffs attempt to establish evidentiary support for the claim." (Wilson v. Parker, Covert & Chidester, supra, 28 Cal.4th 811, 821, 123 Cal.Rptr.2d 19, 50 P.3d 733.)
Twin Labs contends Nagel failed to prove the list of ingredients on the labels and the Web site was actually false. Twin Labs relies heavily on the Food and Drug Administration (FDA) regulations defining a dietary supplement as misbranded if the actual amount of a dietary ingredient in the supplement is not at least equal to 80 percent of the amount stated on the label. (21 C.F.R. § 101.9(g)(4) (2002).) Title 21 of the Code of Federal Regulations part 101.36(f)(1), which deals with the nutritional labeling of dietary supplements, states, "Compliance with this section will be determined in accordance with § 101.9(g)(1) through (g)(8)." Twin Labs relies on title 21 of the Code of Federal Regulations part 101.9(g)(4)(ii), which provides: "Class II vitamin, mineral, protein, total carbohydrate, dietary fiber, other carbohydrate, polyunsaturated or monounsaturated fat or potassium. The nutrient content of the composite is at least equal to 80 percent of the value for that nutrient declared on the label." (Italics added.) In its appellate brief, Twin Labs omits entirely the italicized portion of the above provision, and instead reads the text as subjecting the content of the dietary ingredient ma huang or ephedra to the 80 percent rule. We cannot agree the 80 percent rule necessarily applies to all ingredients in a dietary supplement, but read part 101.9(g)(4)(ii) of title 21 of the Code of Federal Regulations as applicable only to those ingredients specified.
Even if part 101.9(g)(4)(h) of title 21 of the Code of Federal Regulations applied, there would be two unavoidable problems with Twin Labs' argument. First, the federal government's determination that a 20 percent inaccuracy on the label of a dietary supplement is acceptable does not mean a reasonable consumer would not be misled by it, nor does it mean that under California law the advertising cannot be deemed false. "[T]he policies which are furthered by the California statutes would be undermined by the filed rate doctrine's presumption of a consumer's omniscience of filed rates, and the resulting immunity to common carriers, regardless of any advertising deception used to lure the consumer." (Day v. AT & T Corp., supra, 63 Cal.App.4th 325, 331, 74 Cal.Rptr.2d 55 [phone carrier's compliance with federal filed rate doctrine did not immunize it from claims of unfair competition and false advertising under California law].)
The Federal Food, Drug, and Cosmetic Act deems any food to be misbranded "[i]f (1) its labeling is false or misleading in any particular" (21 U.S.C. § 343(a)(1)), and deems dietary supplements to be misbranded if "the label or labeling of the supplement fails to list(i) the name of each ingredient of the supplement that is [an herb or other botanical]; and (ii)(I) the quantity of each such ingredient" (21 U.S.C. § 343(s)(2)(A)(i) & (ii)(I)). The language of the federal statute appears to support Nagel rather than Twin Labs in this regard. Moreover, as Nagel points out, at least one of the test results admitted as evidence in opposition to the section 425.16 motion was not equal to 80 percent of the amount stated on the label, and one test result alone would be sufficient to establish a probability of prevailing on the merits.
*431 Second, Twin Labs argues the FDA regulations do not define "standardized" to mean "exact," thereby proving the Ripped Fuel labels are neither false nor misleading. Indeed, neither the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.) nor the FDA regulations promulgated thereunder (21 C.F.R. § 101.1 et seq.) define "standardized" at all.
Whether or not Ripped Fuel complies with the FDA regulations, given the evidence and standard of proof at this stage, the use of the term "standardized" on the Ripped Fuel labels appears likely to mislead a reasonable consumer.
Twin Labs also argues on appeal it uses specifications when testing its finished products, allowing between 90 percent and 125 percent of the amount stated on the Ripped Fuel labels as an acceptable level of the ma huang extract. In support of the motion to strike, Twin Labs submitted a declaration stating all the test results supporting Nagel's claim were within Twin Labs' specifications. In a consumer interest action such as this one, the appropriate consideration is not what the defendant's own policies allow, but whether the list of ingredients on the product labels and Twin Labs' Web site would mislead a reasonable consumer.
Finally, Twin Labs argues Nagel failed to offer evidence that any of the tested samples of Twin Labs' products were actually sold in California. Twin Labs produces over one million capsules of dietary supplements containing the ma huang extract per day. Given Twin Labs' acknowledgement that Ripped Fuel is sold in California and the test results showing an absence of standardization, we consider it reasonable to infer some amount of Ripped Fuel not standardized to contain 6 percent ephedrine has been sold in this state; there was no evidence to the contrary.
Twin Labs also contends Nagel failed to show the challenged statements would tend to mislead or deceive reasonable consumers. Twin Labs relies primarily on one federal district court opinion and one order from the Los Angeles County Superior Court to support this argument. Haskell v. Time, Inc. (E.D.Cal. 1997) 965 F.Supp. 1398 was decided following a motion for summary judgment, at which stage the standard of proof is far different than the standard for a section 425.16 motion to strike. In any case, "federal decisional authority is neither binding nor controlling in matters involving state law." (Howard Contracting, Inc. v. G.A. MacDonald Construction Co. (1998) 71 Cal.App.4th 38, 52, 83 Cal.Rptr.2d 590.) The Los Angeles County Superior Court order is of no precedential value.
A reasonable inference can be drawn from the evidence presented that a reasonable consumer would be misled by Twin Labs' labels and Web site information. The trial court properly found Nagel made a sufficient showing of the probability of prevailing on the merits of his claims.

DISPOSITION
The order denying the motion to strike is affirmed. Nagel shall recover his costs on appeal.
WE CONCUR: BEDSWORTH, Acting P.J., and O'LEARY, J.
NOTES
[1] Only subdivision (e)(4) of section 425.16 could apply in this case, because the speech at issue was not made before or in connection with an official governmental proceeding, nor was it made in a place open to the public or a public forum in connection with an issue of public interest. (§ 425.16, subd. (e)(1), (2) & (3); Consumer Justice Center v. Trimedica Internat., Inc. (2003) 107 Cal.App.4th 595, 132 Cal.Rptr.2d 191.)