[No. A123009. First Dist., Div. Five. Apr. 13, 2010.]

ALL ONE GOD FAITH, INC., Plaintiff and Appellant, v.
ORGANIC AND SUSTAINABLE INDUSTRY STANDARDS, INC.,
Defendant and Appellant.

1188

**COUNSEL**

Farella Braun & Martell, John L. Cooper and Morgan T. Jackson for Plaintiff and Appellant.

First Amendment Project, David Greene and James R. Wheaton for Defendant and Appellant.

**OPINION**

**BRUINIERS, J.**—The federal government imposes mandatory standards governing the marketing of "organic" food and agricultural products, but provides only voluntary and permissive criteria for "organic" personal care products, such as soaps and lotions. (7 U.S.C. § 6501 et seq.; Organic Foods Production Act of 1990.) A trade association, Organic and Sustainable Industry Standards, Inc. (OASIS), seeks to develop a standard that would provide a definition of "organic" specific to beauty and personal care products

and would permit its members whose products meet this standard to advertise using an "OASIS Organic" seal on the product. All One God Faith, Inc., who does business as Dr. Bronner's Magic Soaps (Dr. Bronner), filed suit against OASIS and certain of its members, alleging that this certification would constitute unfair competition and misleading advertising. OASIS filed a special motion to strike Dr. Bronner's claim against it pursuant to the anti-SLAPP statute,[1] Code of Civil Procedure section 425.16.[2] OASIS appeals from the trial court's denial of its motion. Dr. Bronner has filed a protective cross-appeal, contending that the motion should have also been denied under section 425.17. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. Dr. Bronner's First Amended Complaint

Dr. Bronner filed suit in the San Francisco Superior Court seeking injunctive relief against several of its competitors and against OASIS under California's unfair competition law. (Bus. & Prof. Code, § 17200 et seq.) Only the third cause of action is directed against OASIS.[4] According to Dr. Bronner's first amended complaint (FAC), Dr. Bronner "engages in the business, among other things, of manufacturing and selling . . . personal care and cosmetic products including the nation's top-selling natural brand of liquid and bar soap in a number of varieties under the 'Dr. Bronner's Magic Soaps' brand and lotions, hair rinses, shampoos, hair conditioners, shaving gels and balms under the brand, 'Dr. Bronner's Magic.' " Dr. Bronner's products are labeled either as "Made with Organic Oils" or as "Organic" in accordance with voluntary criteria promulgated by the U.S. Department of Agriculture's (USDA) National Organic Program (NOP), established under the Organic Foods Production Act of 1990.[5] (7 U.S.C. § 6501 et seq.)

As the FAC explains, "[t]he NOP criteria only govern personal care products that voluntarily represent or imply that they meet the NOP criteria or carry the USDA organic seal. The NOP regulations do not apply to personal

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1 [3 Cal.Rptr.3d 636, 74 P.3d 737].)

[2] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

[3] We consider the facts as set forth in the pleadings and supporting and opposing affidavits. (§ 425.16, subd. (b)(2).)

[4] The third cause of action also includes allegations against a French corporation, Ecocert, which Dr. Bronner alleges is improperly certifying beauty products as "organic" under its own standard. Ecocert did not join in the motion to strike and is not a party to this appeal.

[5] The FAC does not contend that the California Organic Products Act of 2003 has any application to these claims. (Health & Saf. Code, § 110810 et seq.)

care products that represent that they are organic but do not purport to comply with the NOP organic criteria and do not carry or imply that they carry the USDA organic seal." Under the NOP criteria, a personal care product labeled "Organic" must contain at least 95 percent organically produced ingredients (excluding water and salt) and the remaining ingredients must consist of approved nonagricultural substances or nonorganically produced agricultural products that are not commercially available in organic form. Furthermore, under the NOP criteria, a personal care product labeled "Organic" or "Made with Organic [specified ingredients]" cannot contain any cleansing or moisturizing agents made of synthetic petrochemicals or petrochemical compounds. Processes such as hydrogenation and sulfation are not permitted to produce such agents.

Dr. Bronner alleges that OASIS is a commercial trade association and that its members include many of the other named defendants, who sell competing personal care products. Dr. Bronner alleges that OASIS was designed to represent and promote the commercial goals of its member companies in their efforts to sell "organic" personal care products. According to Dr. Bronner's FAC, "[t]he primary immediate goal of OASIS has been to issue an industry standard for 'organic' personal care products, and to promote the commercial and sales goals of its members in the marketplace seeking to sell body care products to consumers seeking to purchase organic products. In doing so, OASIS acts as the agent of its trade association members as to whose products OASIS promotes through its purported certifications."

Dr. Bronner contends that OASIS issued a new standard that would allow a product to be labeled as "Organic" even if containing cleansing agents made from nonorganic material that has been hydrogenated and/or sulfated, and preserved with synthetic petrochemicals. According to the allegations of the FAC, the development of the OASIS standard was "promoted principally by Defendant [Estée] Lauder[, Inc.,] but . . . was also supported by other Defendants including Hain Celestial [Group, Inc.,] and Cosway [Company, Inc.]"[6] Dr. Bronner alleges that it has been informed that Estée Lauder "plans to imminently label its products as certified 'Organic' in accordance with the [OASIS] standard . . . ."[7] Dr. Bronner seeks injunctive relief, claiming that "[u]nless OASIS is enjoined from such deceptive certification of products, and [Estée] Lauder is enjoined from marketing such products, Dr. Bronner's

---

[6] In the first and second causes of action, Dr. Bronner alleges that defendants Estée Lauder, Hain Celestial, and Cosway (among others) have or will engage in unfair competition and misleading advertising by labeling their products as "Organic" or "Made with Organic ingredients."

[7] We do not address any argument that the third cause of action is not justiciable. That argument is beyond the issues presented by the anti-SLAPP motion or by the parties on appeal.

will lose business to Defendants [Estée] Lauder and other companies, as a result of the fact that Defendant OASIS's certification of these products as 'Organic' constitutes an unfair and unlawful business practice and false and deceptive advertising, in that consumers . . . will be misled into buying these OASIS-certified products instead of personal care products manufactured and sold by Dr. Bronner's." In its prayer for relief, Dr. Bronner asks that OASIS "be permanently enjoined from certifying as 'Organic' any product for sale within the State of California which cannot lawfully be labeled as 'Organic' under the NOP criteria . . . ."

## B. *OASIS's Motion to Strike and Supporting Declarations*

OASIS moved to strike Dr. Bronner's third cause of action pursuant to section 425.16, arguing that OASIS was being sued for exercising its right to free speech—specifically, articulating and publishing its "OASIS Organic" standard. OASIS submitted a declaration from its volunteer chair of the board of directors, Gay Timmons (Timmons), which provides background information about OASIS.

OASIS is a mutual benefit trade association, organized under Internal Revenue Code section 501(c)(6),[8] "formed in 2007 to promote the production of organic and sustainable health and beauty care products." OASIS does not produce or manufacture any cosmetic or personal care products, nor is it engaged, nor does it intend to be engaged, in the business of selling or leasing goods or services. OASIS aims to provide the following services: (1) "[d]evelop, maintain, and administer verifiable certification standards for health and beauty products"; (2) "[p]rovide a forum for educating and communicating to consumers and trade members of the health and beauty industry"; (3) "[p]articipate and advocate for its members in the global marketplace for international collaboration on standards for health and beauty products"; (4) "[s]erve as a link between interested industry producers and qualified suppliers"; and (5) "[c]ommunicate, interact, and collaborate with other agencies concerned with improving the sourcing and longterm environmental and health impact of [h]ealth and [b]eauty products. . . . [¶] . . . OASIS's members range from large, global brands and private label manufacturers of beauty and personal care products to small, specialty brands, raw ingredient manufacturers, and ingredient suppliers." The OASIS board is comprised of 10 members, three of whom are affiliated with defendants Cosway, Estée Lauder, or Hain Celestial. The declaration also explains that "[Estée] Lauder holds only one of the seats on the OASIS Board. OASIS is in

---

[8] This section provides in relevant part that "[b]usiness leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues [are exempt from taxation when] not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual." (26 U.S.C. § 501(c)(6).)

no way dominated or controlled by [Estée] Lauder. Nor has [Estée] Lauder played the leading role in creating or promoting the 'OASIS Organic' standard."

The declaration further provides that, for several months before the motion to strike was filed, OASIS had been working to develop an "OASIS Organic" standard that would provide a definition of "organic" specific to beauty and personal care products. At the time the motion to strike was filed, OASIS had not yet completed its formulation of the standard, but had released a series of draft standards to the industry and public, via its Web site, for comment. OASIS had also received approximately 50 inquiries from members of the public regarding its draft standards. Once the standard is finalized, those of OASIS's members "whose products meet the 'OASIS Organic' standard, as determined by [a] third party certification agent, may then choose to advertise their products as meeting the 'OASIS Organic' standard [by] display[ing] the 'OASIS Organic' certification mark on the product."[9] The "OASIS Organic" seal appears as a circle, with the word "oasis" inside the circle, and the word "organic" appearing in larger font below the circle. If an OASIS member chooses to so advertise, it must "indicate that the 'OASIS Organic' standard was employed, display the 'OASIS Organic' certification mark on the product, and direct [its] consumers to the details of the standard." OASIS intends to publish the final standard to the general public so that the public has access to what "OASIS Organic" means.

At the time the motion to strike was filed, OASIS had not yet authorized any entity to use the "OASIS Organic" label and no product bearing the "OASIS Organic" seal was on the market, or likely to be on the market for at least several months. Timmons declares that OASIS itself does not currently certify, and does not plan to certify, any products. OASIS only intends to set

---

[9] The declaration states: "OASIS has adopted a certification mark for 'OASIS Organic' that will be filed with the U.S. Patent and Trademark Office, along with the 'OASIS Organic' standard, when the standard is finalized . . . ." A certification mark is "any word, name, symbol, or device, or any combination thereof—[¶] (1) used by a person other than its owner, or [¶] (2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter, [¶] to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization." (15 U.S.C. § 1127.) On this record, we simply do not know if OASIS will ultimately meet the requirements for registration of a certification mark. In fact, Dr. Bronner does not concede that OASIS will comply with the requirements for certification marks and suggests that it may petition for cancellation of OASIS's mark.

Nevertheless, Dr. Bronner's third cause of action is premised on the allegation that one or more of defendants plan to "imminently" label products as "certified 'Organic' in accordance with the [OASIS] standard . . . ," and OASIS agreed that in creating the OASIS organic seal it "is 'certifying' as that term is used in the context of certification marks." In part II.B. and C. *post*, we base our decision on the record before the trial court.

the standard that will be employed by third party certification agents who will perform all product certification.

OASIS also submitted, in support of its motion to strike, three newspaper articles, dating from the 1970's, on the topics of "natural" and "organic" food and cosmetics.

C. *Dr. Bronner's Opposition to the Motion to Strike*

Dr. Bronner opposed the motion to strike, arguing that it had not challenged speech "in connection with a public issue or an issue of public interest," as required by section 425.16. Alternatively, Dr. Bronner argued that OASIS's commercial speech was specifically exempted from the protections of the anti-SLAPP statute by section 425.17, subdivision (c).[10]

The parties stipulated that the trial court, in deciding the motion, could consider the application, obtained from OASIS's Web site, by which one applies to become a member of OASIS. The membership application provides: "Welcome to OASIS, an organization whose purpose is to support organic and sustainable Health & Beauty consumer goods. OASIS meets the unprecedented consumer demand for reliable production standards for companies pursuing a greater share of the Organic and Sustainable Market. . . . [¶] . . . [¶] Organic And Sustainable Industry Standards — OASIS — was formed by a group of concerned trade professionals, and we are pleased to invite you to join today. Join as a *voting member* if you plan on certifying a Health and Beauty product or ingredients made using organic raw materials. Join as a *supporting member* if you work in a supporting role in the production of sustainable Health and Beauty products." (Boldface omitted.) The application describes OASIS's mission: "OASIS is dedicated to providing verifiable standards that support and promote organic and sustainable

---

[10] As discussed in greater detail *post*, section 425.17, subdivision (c) provides: "Section 425.16 does not apply to any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer, or the statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation, except where the statement or conduct was made by a telephone corporation in the course of a proceeding before the California Public Utilities Commission and is the subject of a lawsuit brought by a competitor, notwithstanding that the conduct or statement concerns an important public issue." (§ 425.17, subd. (c).)

production for the Health and Beauty Industry, utilizing principles of incremental improvement and continuous change. The OASIS seal provides assurance to the consumer of credible value for organic and sustainable claims on OASIS products." (Italics omitted.)

The application also provides: "The By Laws of OASIS define that 'voting' members must either be in the process to become certified for a product or have been certified." Voting membership fees range from $300 to $5,000. The suggested membership fee for a supporting member is $100.

### D. *The Trial Court Ruling and Current Appeal*

By trial court order, not contained in the record but acknowledged by the parties, briefing and argument on the motion to strike was bifurcated, with the first portion of the hearing limited to the threshold question of whether OASIS's alleged conduct constituted an "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue."

On October 8, 2008, the court denied OASIS's motion to strike in an order stating only that the motion was denied (October 8 Order). OASIS filed a timely notice of appeal from the October 8 Order. Dr. Bronner filed a motion to dismiss the appeal, asserting that the trial court could have based its denial of the motion to strike on the commercial speech exemption contained in section 425.17, subdivision (c) and, if so, the October 8 Order was not appealable pursuant to section 425.17, subdivision (e).[11] We deferred ruling on the motion to dismiss and ordered the trial court to file "an amended order clarifying the reason why it denied the motion to strike."

In response, the trial court filed an amended order (Amended Order), which clarifies that the motion to strike was denied under section 425.16 alone and was "not based in any part upon . . . section 425.17." The Amended Order further provides: "The alleged conduct of OASIS does not constitute an 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' within the meaning of section 425.16. Authorities supporting that conclusion include *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939 [119 Cal.Rptr.2d 296, 45 P.3d 243], *Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39 [134 Cal.Rptr.2d

---

[11] Section 425.16, subdivision (i) provides: "An order granting or denying a special motion to strike shall be appealable under Section 904.1." (See also § 904.1, subd. (a)(13).) However, section 425.17, subdivision (e) provides: "If any trial court denies a special motion to strike on the grounds that the action or cause of action is exempt pursuant to this section, the appeal provisions in subdivision (j) of Section 425.16 and paragraph (13) of subdivision (a) of Section 904.1 do not apply to that action or cause of action."

420], and *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595 [132 Cal.Rptr.2d 191]." With respect to section 425.17, the trial court stated: "The alleged conduct of OASIS does not fall under section 425.17[, subdivision] (c) because OASIS, while a trade group consisting of, and acting on behalf of, its members who are in the business of selling goods, is not itself 'a person primarily engaged in the business of selling or leasing goods or services.' The plain language of section 425.17[, subdivision] (c) does not extend to trade associations not themselves engaged in the business of selling or leasing goods or services, and to this Court's knowledge there is no appellate decision holding or stating otherwise."

Thereafter, we denied Dr. Bronner's motion to dismiss OASIS's appeal. Dr. Bronner also filed a timely cross-appeal from the Amended Order. OASIS moved to dismiss Dr. Bronner's cross-appeal on the grounds that Dr. Bronner was not aggrieved by the Amended Order. We denied the motion.[12]

## II. Discussion

### A. *The Anti-SLAPP Statute*

██ The Legislature adopted the anti-SLAPP statute in 1992, finding that "it is in the public interest to encourage continued participation in matters of public significance, and . . . this participation should not be chilled through

---

[12] While this case was being briefed, Dr. Bronner and OASIS each filed several requests for judicial notice, on which we deferred ruling. First, OASIS filed a request for judicial notice of various documents posted on the USDA's Web site regarding proceedings before the National Organic Standards Board. Dr. Bronner later filed its own request for judicial notice of the contents and existence of an article by Andrea Nagel, which appeared in the March 14, 2008 newspaper "Women's Wear Daily," entitled "Natural Personal Care to Get Standards." OASIS opposed this request, to the extent we were asked to take judicial notice of the truth of the matters contained within the article. Then, OASIS filed an unopposed request for judicial notice of (1) an index with links to public comments made in response to a notice of meeting of the National Organic Standards Board, discussing whether and how to adapt the NOP standards to cosmetics; (2) excerpts from the U.S. Patent and Trademark Office's Trademark Manual of Examining Procedure (5th ed.); and (3) the trial court's June 1, 2009 order on a motion for judgment on the pleadings filed by three other defendants. Finally, Dr. Bronner filed an opposed request for judicial notice of the following statement on OASIS's Web site: "The OASIS Seal promotes the marketing of [health and beauty] products." We deny Dr. Bronner's requests for judicial notice. The truth of the contents of the article and Web site are not proper matters for judicial notice, and the fact that the article and Web site were published is irrelevant to the issues before us. (See *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1141, fn. 6 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) OASIS's requests for judicial notice are granted, in part. (Evid. Code, § 452, subd. (c).) We deny OASIS's request for judicial notice of the trial court's June 1, 2009 order on a motion for judgment on the pleadings because the order is irrelevant. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1 [104 Cal.Rptr.2d 377, 17 P.3d 735] [material to be judicially noticed must be relevant].) OASIS's other requests for judicial notice are granted.

abuse of the judicial process." (§ 425.16, subd. (a).) Section 425.16, subdivision (b)(1) provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." In order to protect the constitutional rights of petition and free speech, the statute is to be broadly construed. (§ 425.16, subd. (a).)

■ The Supreme Court has "summarize[d] a court's task in ruling on an anti-SLAPP motion to strike as follows. Section 425.16, subdivision (b)(1) requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685], first bracketed material added (*Equilon*).)

The question of whether an anti-SLAPP motion to strike should have been granted is reviewed independently. (*Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1283 [74 Cal.Rptr.3d 873]; *Navarro v. IHOP Properties, Inc.* (2005) 134 Cal.App.4th 834, 839 [36 Cal.Rptr.3d 385]; *Consumer Justice Center v. Trimedica International, Inc., supra*, 107 Cal.App.4th at p. 599 (*Trimedica*).) Contrary to Dr. Bronner's suggestion, the trial court does not make factual findings in ruling on an anti-SLAPP motion. (See *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 [12 Cal.Rptr.3d 786] ["court considers the pleadings and evidence submitted by both sides, but does not weigh credibility or compare the weight of the evidence"].) Accordingly, we independently review "whether the anti-SLAPP statute applies to the challenged claim. [Citation.] Furthermore, we apply our independent judgment to determine whether [plaintiff's] causes of action arose from acts by [a defendant] in furtherance of [defendant's] right of petition or free speech in connection with a public issue. [Citation.]" (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645 [24 Cal.Rptr.3d 619].)

B. *OASIS Has Not Met Its Burden of Showing That the Challenged Cause of Action Arises from Protected Activity Under the Anti-SLAPP Statute.*

 1. *OASIS's certification activities are not in furtherance of its speech in connection with a public issue or issue of public interest.*

The trial court here addressed only the first step of the two-step *Equilon* process, and denied the motion on the basis that OASIS had failed to show that it had engaged in protected activity. We likewise review this threshold question. We consider whether the trial court correctly concluded that Dr. Bronner's cause of action does not arise from acts in furtherance of OASIS's constitutional right of petition or free speech in connection with a public issue, as required by section 425.16, subdivision (b)(1). "In doing so we review primarily the complaint, but also papers filed in opposition to the motion to the extent that they might give meaning to the words in the complaint. [Citations.]" (*Dible v. Haight Ashbury Free Clinics, Inc.* (2009) 170 Cal.App.4th 843, 849 [88 Cal.Rptr.3d 464] (*Dible*); accord, § 425.16, subd. (b)(2).)

We believe the trial court was correct. While the act of *formulating* a proposed industry "organic" standard may constitute protected activity, we find that the *certification* of products which Dr. Bronner seeks to enjoin in its third cause of action is not. Contrary to the conclusion reached by the dissent, we hold that OASIS's certification activities do not constitute "conduct *in furtherance*" of OASIS's formulation of the standard. (§ 425.16, subd. (e)(4), italics added.)

"The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92 [124 Cal.Rptr.2d 530, 52 P.3d 703]; accord, *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 679 [105 Cal.Rptr.3d 98] (*Stewart*).) "But the mere fact an action was filed after protected activity took place does not mean it arose from that activity." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76–77 [124 Cal.Rptr.2d 519, 52 P.3d 695].) Nor does the fact "[t]hat a cause of action arguably may have been triggered by protected activity" necessarily mean that it arises from such activity. (*Id.* at p. 78.) Rather, "[t]he trial court must instead focus on the substance of the plaintiff's lawsuit in analyzing the first prong of a special motion to strike. [Citations.]" (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 669–670 [35 Cal.Rptr.3d 31].) "In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]" (*City of Cotati v. Cashman, supra*, 29 Cal.4th at p. 78.)

"[T]he 'arising from' requirement is not always easily met. [Citations.] The only means specified in section 425.16 by which a moving defendant can satisfy the requirement is to demonstrate that the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e), defining subdivision (b)'s phrase, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue.' [Citation.]" (*Equilon, supra,* 29 Cal.4th at p. 66.) Section 425.16, subdivision (e) provides: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

■ OASIS argues that subdivision (e)(4) of section 425.16, protecting "conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest," applies here. We disagree. As the Fourth Appellate District explained in *Trimedica,* "[w]hen the defendant's alleged acts fall under the first two prongs of section 425.16, subdivision (e) (speech or petitioning before a legislative, executive, judicial, or other official proceeding, or statements made in connection with an issue under review or consideration by an official body), the defendant is not required to independently demonstrate that the matter is a 'public issue' within the statute's meaning. [Citation.] If, however, the defendant's alleged acts fall under the third or fourth prongs of subdivision (e), there is an express 'issue of public interest' limitation. [Citation.]" (*Trimedica, supra,* 107 Cal.App.4th at p. 600.) OASIS has not demonstrated that the "public interest" limitation is satisfied.

■ The court in *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534 [33 Cal.Rptr.3d 145], noted that section 425.16 does not define "an issue of public interest," but explained: " 'A few guiding principles may be derived from decisional authorities. First, "public interest" does not equate with mere curiosity. [Citations.] Second, a matter of public interest should be something of concern to a substantial number of people. [Citation.] Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. [Citation.] Third, there should be some degree of closeness between the challenged statements and the asserted

public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation]. Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort "to gather ammunition for another round of [private] controversy . . . ." [Citation.] . . . A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people. [Citations.]' [Citation.]" (*Terry*, at pp. 1546–1547, final elipsis and citation omission added.) "The 'public interest' component of section 425.16, subdivision (e)(3) and (4) is met when 'the statement or activity precipitating the claim involved a topic of widespread public interest,' and 'the statement . . . in some manner itself contribute[s] to the public debate.' [Citation.]" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1246 [29 Cal.Rptr.3d 521], citation omission added.)

OASIS, in its opening brief, contends that it has been sued for its "opinion as to what makes a personal care product 'organic' " or "the articulation and dissemination of the ['OASIS Organic'] standard." Accordingly, OASIS argues that Dr. Bronner's third cause of action attacks speech in connection with a public issue because "the speech was made during the course of an active public debate on the issue, a debate joined by governmental, commercial and consumer interests; the resolution of the issue will affect large numbers of people beyond the direct participants; the speech was developed with public input; the issue is neither broad nor amorphous and is the very conduct for which OASIS is being sued."

But, contrary to OASIS's assertion, Dr. Bronner's claims do not arise out of OASIS's articulation of the "OASIS Organic" standard in the abstract. Rather, Dr. Bronner's claims are based on the fact that OASIS will authorize its members, whose products meet the standard, to use the "OASIS Organic" seal on their products in the marketplace. In fact, OASIS will *require* those members who choose to advertise their products as meeting the "OASIS Organic" standard to display the "OASIS Organic" seal on their products. Dr. Bronner specifically alleges that it will be injured because "many consumers will be misled *by the certification of products by the OASIS trade association as 'Organic'* to purchase such products rather than Dr. Bronner's soap products."[13] (Italics added.) Accordingly, Dr. Bronner seeks to enjoin OASIS from certifying such products that meet the "OASIS Organic" standard, but not the NOP standard.

---

[13] OASIS originally argued in its opening brief that it will not "certify" products as meeting the "OASIS Organic" standard, because that task will actually be performed by third party certifying agencies. However, in its reply brief, OASIS acknowledges that "it will set the terms for the use of the 'OASIS Organic' seal and be the entity that ultimately authorizes a manufacturer to affix the seal on a product label." OASIS also agreed that "in so doing its [*sic*] is 'certifying' as that term is used in the context of certification marks."

In its reply brief, OASIS concedes that it is not being sued for *articulating* the "OASIS Organic" standard and that, instead, it "is being sued because it intends to make representations of fact about some of its members' 'goods,' not its own." Nonetheless, OASIS argues that its "act of authorizing others to use the 'OASIS Organic' seal is conduct *in furtherance* of OASIS's right to articulate and disseminate its statement of position as to the meaning of the word 'organic.' "

As we have indicated, while OASIS's articulation and dissemination of a standard regarding what makes a personal care product "organic" may constitute an exercise of its right of free speech on a matter of public concern, we do not agree that OASIS's certification of commercial products—the activities that Dr. Bronner seeks to enjoin—are in furtherance of that speech.

Our dissenting colleague relies on *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156 [1 Cal.Rptr.3d 536] (*Lieberman*). As we explain, while the *Lieberman* court's explication of the statutory term "in furtherance of" may be generally useful to an analysis of section 425.16, subdivision (e)(4)'s application, the decision is factually distinguishable. The Second District Court of Appeal has concluded that the "in furtherance" language found in section 425.16, subdivision (e)(4), means "helping to advance, assisting." (110 Cal.App.4th at p. 166, italics omitted.) The plaintiff doctor in *Lieberman* alleged that the defendant, KCOP Television, Inc. (KCOP), made secret recordings of his conversations with patients. It was further alleged that KCOP broadcast a news report, using excerpts from the secret recordings, in which the plaintiff was accused of improperly prescribing controlled substances. (*Id.* at pp. 161–162.) The plaintiff's complaint alleged only that the secret recordings violated Penal Code section 632. The plaintiff did not allege claims for defamation or invasion of privacy resulting from the broadcast itself. (110 Cal.App.4th at p. 163.) On review of the denial of the defendant's anti-SLAPP motion, the court concluded that "the broadcast was an act in furtherance of the appellant's exercise of a constitutional right to free speech in connection with a public issue, as defined in section 425.16. [Citations.]" (*Id.* at p. 165.) Because the surreptitious recordings were in aid of and were incorporated into the broadcast in connection with a public issue, the court concluded that the plaintiff's complaint "fell within the scope of section 425.16." (*Id.* at p. 166.)

Here, unlike the conduct at issue in *Lieberman*, the articulation of the OASIS standard will necessarily be complete *before* OASIS certifies any member product. OASIS, and our dissenting colleague, fail to show how the application of an "OASIS Organic" seal on a particular product helps to advance or foster a debate that will have already occurred on the meaning of "organic" as used in the "OASIS Organic" seal, or that it will in some fashion

contribute to a broader debate on the meaning of the term "organic."[14] The "OASIS Organic" seal, when viewed by a consumer on a particular product, is merely a representation regarding the product's ingredients and quality. Although, OASIS states that it will require members using the seal to direct their consumers to the details of the standard, there is no indication in the record of how that will be achieved. Nor does Dr. Bronner challenge any such statements by its pleadings. While the existence of some standard may be a sine qua non to creation of a certification mark, the "OASIS Organic" seal itself does not include any discussion of what the standard is, so as to encourage or contribute to public debate on the issue.[15] Furthermore, unlike the draft standards that have been published on OASIS's Web site, there is nothing in the record before us to indicate that use of the "OASIS Organic" seal on a product will invite comment from the public, that the discussion has been or will be more robust by virtue of the anticipated certification process, or that it is intended that the standard will necessarily "evolve over time" as the dissent suggests. (Dis. opn., *post*, at p. 1221, fn. 6.) The purpose of the " 'OASIS Organic' seal" is to promote the sale of the *product* to which it is affixed, not the standard or its elements.[16]

---

[14] The dissent argues that interest in the formulation of the standard is logically "materially enhanced" by the fact that it will result in a product certification, and that the *future act* of product certification necessarily promotes interest and participation in the *earlier* debate over what the standard should be. (Dis. opn., *post*, at p. 1225.) Nothing reflected in the record before us validates that hypothesis, and simply to say that a logical nexus can be found between a protected activity and a consequential one with a different purpose expands, as the dissent appears to acknowledge, the "in furtherance" element of the anti-SLAPP statute beyond the boundaries recognized in any case to date. Furthermore, the dissent's hypothesis rests on the assumption that the future act of product certification will promote manufacturers' interest and participation in the debate over the standard. (*Ibid.*) It fails to show how the consuming public's interest in the standard will be increased.

[15] OASIS's reliance on *Stewart, supra*, 181 Cal.App.4th at pages 677–678, is misplaced. In *Stewart*, the reviewing court concluded that publication of musicians' names within a five-page editorial feature, which appeared adjacent to advertising for Camel cigarettes in Rolling Stone magazine, "constitutes conduct in furtherance of [Rolling Stone's] right of free speech 'in connection with a public issue or an issue of public interest.' " (*Id.* at p. 678.) However, the editorial feature *itself* concerned an extremely popular genre of music and was "a creatively crafted, whimsical editorial commentary on the many bands whose musical works have contributed to the development of the genre." (*Id.* at p. 677.) The court reasoned: " ' "there is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities . . . ." [Citation.]' [Citation.]" (*Id.* at pp. 677–678, final citation omission added.)

[16] As the dissent notes, certification marks, such as the Good Housekeeping and Underwriters Laboratories seals of approval provide product information to consumers which " 'saves buyers the trouble of investigating products themselves and the risk of trying untested products.' " (Dis. opn., *post*, at p. 1222; see *id.* at p. 1221, fn. 8; *Consolidated Metal Prod. v. Amer. Petro. Institute* (5th Cir. 1988) 846 F.2d 284, 296.) It is the marks themselves, as representations of quality, upon which consumers rely in purchasing decisions, and the well-established reputations of the entities which authorize them, not the standards upon which the product certifications are based. We are not persuaded that many, if any, consumers

■ Thus, we reject OASIS's claim that by certifying a member product to use its seal, it speaks with an educational purpose or contributes to an ongoing public debate about organic standards. It is not necessary for OASIS to certify individual products and authorize members to use its "OASIS Organic" seal on products in order for OASIS to express its general opinion about what constitutes an "organic" personal care product. Because that goal will otherwise be achieved by the articulation of the standard, we conclude that the challenged speech is not in furtherance of OASIS's exercise of free speech in connection with a public issue. (See *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 615 [129 Cal.Rptr.2d 546] [although plaintiff's "action was an attack on the process of [judicial candidate] evaluations, that process was inextricably intertwined with and part and parcel of the evaluations," which were undisputedly protected speech].)

 2. *OASIS's commercial speech is not protected activity on an issue of public interest.*

Dr. Bronner alleges that OASIS, by authorizing its members to use the "OASIS Organic" seal on products in the marketplace, will mislead consumers with respect to the products' ingredients. OASIS's own membership application provides: "Welcome to OASIS, an organization whose purpose is to support organic and sustainable Health & Beauty consumer goods. OASIS meets the unprecedented consumer demand for reliable production standards for companies pursuing a greater share of the Organic and Sustainable Market." (Boldface omitted.) It also states: "The OASIS seal provides assurance to the consumer of credible value for organic and sustainable claims on OASIS products." (Italics omitted.) In fact, OASIS concedes that its speech is commercial speech, under the test announced in *Kasky*, and that it "seeks to promote its members['] general business interest" through the "OASIS Organic" seal.[17]

In *Kasky v. Nike, Inc., supra,* 27 Cal.4th 939 (*Kasky*), Nike and its officers and directors, in response to public criticism and to maintain and increase

---

themselves investigate the basis for an Underwriter's Laboratories label upon a product, or offer comments on the testing protocols used to achieve it.

[17] OASIS would have us ignore this context. OASIS's reliance on *Dible, supra,* 170 Cal.App.4th at page 851, is misplaced. The *Dible* court did observe: "*If the actionable communication fits within the definition contained in the statute,* the motive of the communicator does not matter. [Citation.]" (Italics added.) But, in that case, the reviewing court determined that the defendant's speech about a former employee, made to the Employment Development Department, qualified "as statements made 'before a legislative, executive, or judicial proceeding, or any other official proceeding' (§ 425.16, subd. (e)(1)) or made 'in connection with an issue under consideration or review' by such (§ 425.16, subd. (e)(2))." (*Dible, supra,* 170 Cal.App.4th at p. 850.) Accordingly, the speech was not required to be on a topic of public interest. (*Ibid.*) In any event, our conclusion that section 425.16 does not apply is based on the nature of OASIS's activity, rather than OASIS's motivations for its actions.

Nike's profits, issued allegedly false statements in press releases and in other public relations materials. Nike and its officers and directors stated that "workers who make Nike products are protected from physical and sexual abuse, that they are paid in accordance with applicable local laws and regulations governing wages and hours, that they are paid on average double the applicable local minimum wage, that they receive a 'living wage,' that they receive free meals and health care, and that their working conditions are in compliance with applicable local laws and regulations governing occupational health and safety." (*Id.* at pp. 947–948.) The Supreme Court, in a four-to-three vote, concluded that neither the First Amendment nor the California Constitution protected Nike's speech from regulation under California's false advertising laws because it constituted "commercial speech that may be regulated to prevent consumer deception." (27 Cal.4th at p. 969.)

■ The majority observed that, under United States Supreme Court precedent, "commercial speech that is false or misleading is not entitled to First Amendment protection and 'may be prohibited entirely.' [Citations.]" (*Kasky, supra,* 27 Cal.4th at p. 953.) The majority then enumerated the reasons for the distinction between commercial and noncommercial speech: "First, '[t]he truth of commercial speech . . . may be *more easily verifiable by its disseminator* than . . . news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else.' [Citations.] [¶] Second, commercial speech is *hardier* than noncommercial speech in the sense that commercial speakers, because they act from a profit motive, are less likely to experience a chilling effect from speech regulation. [Citations.] [¶] Third, governmental authority to regulate commercial transactions to prevent commercial harms justifies a power to regulate speech that is ' "linked inextricably" to those transactions.' [Citations.]" (*Id.* at pp. 954–955, citation and paragraph format omissions added.)

■ In distinguishing commercial speech from noncommercial speech, the Supreme Court explained that courts must consider three elements: "the speaker, the intended audience, and the content of the message. [¶] In typical commercial speech cases, the speaker is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—*or someone acting on behalf of a person so engaged*, and the intended audience is likely to be actual or potential buyers or customers of the speaker's goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers. . . . [¶] . . . [¶] Finally, the factual content of the message should be commercial in character. In the context of regulation of false or misleading advertising, this typically means that the speech consists of representations of

fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services." (*Kasky, supra,* 27 Cal.4th at pp. 960–961, italics added & omitted.)

*Kasky* did not involve the anti-SLAPP statute. However, several recent cases have concluded that a manufacturer's advertising statements about a commercial product are not subject to the protection of section 425.16 when the specific nature of the speech, rather than the generalities that might be abstracted from it, do not involve a matter of public interest. (*Nagel v. Twin Laboratories, Inc., supra,* 109 Cal.App.4th at pp. 47–48, 50 (*Nagel*); *Trimedica, supra,* 107 Cal.App.4th at pp. 599, 601–602; *Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 420–423 [9 Cal.Rptr.3d 242] (*Scott*); see also *Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34 [1 Cal.Rptr.3d 390] [telemarketing]; *Jewett v. Capital One Bank* (2003) 113 Cal.App.4th 805, 807, 815 [6 Cal.Rptr.3d 675] [credit card solicitations].)

In *Trimedica,* a consumer advocacy group brought an action for false advertising and consumer fraud against a supplement manufacturer who claimed its product, Grobust, offered " 'The All-Natural Way To A Fuller, More Beautiful Bust!' " (*Trimedica, supra,* 107 Cal.App.4th at pp. 598–599.) The defendant filed a special motion to strike, pursuant to section 425.16, arguing that herbal dietary supplements in general were a subject of public interest. (*Trimedica,* at pp. 599, 601.) The court rejected this claim, noting, "Trimedica's speech is not about herbal supplements in general. It is commercial speech about the specific properties and efficacy of a particular product, Grobust. If we were to accept Trimedica's argument that we should examine the nature of the speech in terms of generalities instead of specifics, then nearly any claim could be sufficiently abstracted to fall within the anti-SLAPP statute." (*Id.* at p. 601.) The court distinguished *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562 [92 Cal.Rptr.2d 755] (*DuPont*),[18] by observing: "Grobust does not treat life-threatening conditions such as stroke and pulmonary embolism, nor is there

---

[18] In *DuPont, supra,* 78 Cal.App.4th 562, a class action lawsuit was filed against the manufacturer of the drug Coumadin. (*Id.* at p. 564.) The plaintiffs alleged the manufacturer artificially inflated the price of the drug by disseminating false information concerning an alternative generic product to regulatory and legislative bodies, the medical profession, and to the public. (*Id.* at pp. 564–565.) In reviewing the trial court's decision on the defendant's special motion to strike, the Fourth Appellate District first concluded that the defendant's lobbying activities satisfied the requirements of section 425.16, subdivision (e)(1). (78 Cal.App.4th at pp. 565–566.) The court also concluded that the manufacturer's advertising to doctors and the public was " 'in connection with a public issue.' " (*Id.* at pp. 566–567.) In reaching that conclusion, the court looked to the plaintiffs' complaint, which stated: " 'More than 1.8 million Americans have purchased Coumadin, an anti-coagulant medication, for the prevention and

evidence it is widely used. Therefore, Grobust does not qualify as a matter of public interest by examining either 'the number of persons allegedly affected' or 'the seriousness of the conditions treated . . . .' [Citation.]" (*Trimedica, supra*, 107 Cal.App.4th at p. 602, original ellipsis.) The court concluded that the "public interest" limitation had not been met, reasoning: "No logical interpretation of [section 425.16, subdivision (a)] suggests that 'matters of public significance' include specific advertising statements about a particular commercial product, absent facts which truly make that product a matter of genuine public interest . . . . Construing the statute in this manner would allow every defendant in every false advertising case . . . to bring a special motion to strike under the anti-SLAPP statute, even though it is obvious that the case was not filed for the purpose of chilling participation in matters of public interest." (*Trimedica, supra*, 107 Cal.App.4th at p. 602.)

*Nagel, supra*, 109 Cal.App.4th 39, presented a scenario analogous to the circumstances presented here. In *Nagel*, the plaintiff sued a supplement manufacturer, and the company whose franchisees sold the product to consumers, for their marketing of a supplement containing ma huang extract. (*Id.* at pp. 42–43.) The plaintiff claimed that the defendants' statements on labels and Web sites regarding the supplement's ingredients were false and misleading. (*Ibid.*) Specifically, the plaintiff contended that the ephedrine in the product was not "standardized" as claimed by the defendants, at least not as the word was popularly understood. (*Id.* at p. 44.) The defendants filed a special motion to strike, arguing that, pursuant to section 425.16, their advertising claims were protected speech on a matter of public interest. (109 Cal.App.4th at p. 44.) The court considered whether subdivision (e)(4) of section 425.16 applied. (109 Cal.App.4th at p. 45 & fn. 1.) The court noted that the list of ingredients was "commercial speech only," which is entitled to less protection than other constitutionally safeguarded forms of expression. (*Id.* at p. 46.)

Turning to the public interest requirement, the court observed: "while matters of health and weight management are undeniably of interest to the public, it does not necessarily follow that all lists of ingredients on labels of food products or on the manufacturers' Web sites are fully protected from legal challenges by virtue of section 425.16. . . . [T]he list of . . . ingredients on the bottle labels and on [the defendants'] Web site was not participation in the public dialogue on weight management issues; the labeling on its face was designed to further [the defendants'] private interest of increasing sales for its products. [Citation.]" (*Nagel, supra*, 109 Cal.App.4th at pp. 47–48.)

---

treatment of blood clots that can lead to life-threatening conditions such as stroke and pulmonary embolism.' " (*Id.* at p. 567.) Based on this allegation, the court reasoned that "[b]oth the number of persons allegedly affected and the seriousness of the conditions treated establish the issue as one of public interest." (*Ibid.*)

Accordingly, the court concluded that the speech was not " 'in connection with a public issue.' " (*Id.* at p. 48.) The court noted that its conclusion was consistent with *Kasky, supra,* 27 Cal.4th 939, *DuPont, supra,* 78 Cal.App.4th 562, and *Trimedica, supra,* 107 Cal.App.4th 595, because the case before it presented only commercial speech, which was not "inextricably intertwined" with noncommercial speech. (*Nagel,* at pp. 49–51.) The *Nagel* court observed that, by contrast, the advertising in *DuPont* was inextricably intertwined with speech providing medical information to the consuming public and the medical profession, as well as with speech furthering the defendant's political lobbying activities. (*Id.* at p. 50.)

 The above authority makes clear that the mere fact that a large number of people may be affected by advertising does not, standing alone, satisfy the public interest requirement. (*Nagel, supra,* 109 Cal.App.4th at p. 50; *DuPont, supra,* 78 Cal.App.4th at p. 567.) Rather, the inquiry is whether the unprotected advertising speech is inextricably intertwined with protected speech informing the consuming public and furthering political debate on a matter of public interest. (*Nagel, supra,* 109 Cal.App.4th at p. 50.) In this case, the use of the "OASIS Organic" seal on member products is not activity directed to public discussion of organic standards in general, but is only speech about the contents and quality of the product. As discussed above, it is not intertwined with speech about, or contributing to the debate on, the merits of a particular definition of "organic."[19]

To the extent that *DuPont* can be read to hold that commercial advertisements, for a product treating a life-threatening medical condition and which affects a large number of people, could alone satisfy the public interest requirement, we are not presented with such a circumstance.[20] (See *DuPont, supra,* 78 Cal.App.4th at p. 567.) Although a large number of consumers may encounter the "OASIS Organic" seal, the personal care products at issue are not intended to remedy life-threatening conditions and the "seriousness of the conditions treated" would hardly meet the *DuPont* criteria. (*Ibid.*)

Nor are we persuaded by OASIS's attempt to distinguish *Nagel, Trimedica,* and *Scott* on the basis that they involved speech by a product manufacturer about its own product, and that it is not such a manufacturer. OASIS is correct that the Third District Court of Appeal in *Scott, supra,* 115 Cal.App.4th

---

[19] For this reason, OASIS's reliance on *Vess v. Ciba-Geigy Corp. USA* (9th Cir. 2003) 317 F.3d 1097 (*Vess*) and *Thomas v. Quintero, supra,* 126 Cal.App.4th 635 is misplaced. Both *Vess* and *Thomas v. Quintero* are explained by the nature of the specific speech at issue. In each case, the challenged speech itself contributed to the debate on an ongoing public controversy, even if it was allegedly motivated in part by private interests. (*Vess, supra,* 317 F.3d at p. 1110; *Thomas v. Quintero, supra,* 126 Cal.App.4th at p. 661.)

[20] No subsequent case has found the public interest requirement to be met by adopting this approach.

404, concluded that "commercial speech about the safety of a product *by the manufacturer of that product* for the purposes of the sale of the product does not constitute an issue of public interest for purposes of section 425.16." (*Id.* at p. 418, italics added.) But, the *Scott* court did not comment on whether the commercial speech of a trade association should be treated in similar fashion. (*Id.* at pp. 418–424.)

■ The fact that the "OASIS Organic" seal will be placed on some member products, rather than its own products, does not automatically, as OASIS asserts, transform its certification activities into "a statement about the larger issue of 'organic' health and beauty care products." "The nature of the communication is not changed when a group of sellers joins in advertising their common product." (*National Com'n on Egg Nutrition v. F. T. C.* (7th Cir. 1977) 570 F.2d 157, 163 [discussing whether statements by trade association formed by members of egg industry were commercial speech]; see also *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 66, fn. 13 [77 L.Ed.2d 469, 103 S.Ct. 2875].) As noted above, OASIS concedes that its speech is commercial speech and that it "seeks to promote its members['] general business interest" through the "OASIS Organic" seal. Although OASIS disavows any intent to endorse "any particular product" in the future, it concedes that only the products of its paying members, who meet the standard, may advertise with the "OASIS Organic" seal. And, OASIS concedes that "only those [members] who plan to use the seal are eligible to become voting members of OASIS . . . ." (Italics omitted.) Thus, we are not talking about true third party endorsement or criticism, in the nature of consumer protection information, as OASIS suggests in its reply brief.[21] Since the certification activities of OASIS in question here are clearly designed to facilitate commerce in the products bearing its seal, it has presented no compelling reason to distinguish this case from *Nagel, Trimedica,* or *Scott.*

Because the "issue of public interest" requirement is not met here, the trial court correctly concluded that section 425.16 does not apply to Dr. Bronner's cause of action against OASIS.[22]

---

[21] For this reason, *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883 [17 Cal.Rptr.3d 497] and *Carver v. Bonds* (2005) 135 Cal.App.4th 328 [37 Cal.Rptr.3d 480] are factually inapposite. OASIS also misplaces its reliance on other cases involving "consumer information" that do not address the "public interest" requirement of the anti-SLAPP statute. (*VA. Pharmacy Bd. v. VA. Consumer Council* (1976) 425 U.S. 748 [48 L.Ed.2d 346, 96 S.Ct. 1817]; *Melaleuca, Inc. v. Clark* (1998) 66 Cal.App.4th 1344 [78 Cal.Rptr.2d 627]; *Paradise Hills Associates v. Procel* (1991) 235 Cal.App.3d 1528 [1 Cal.Rptr.2d 514].)

[22] Accordingly, we need not address OASIS's alternative argument that Dr. Bronner's third cause of action is subject to the anti-SLAPP statute under section 425.16, subdivision (e)(3). Subdivision (e)(3) of section 425.16 applies to "any written or oral statement or writing made in a place open to the public or a public forum *in connection with an issue of public interest.*" (Italics added.)

C. *Section 425.17 Does Not Provide an Alternate Basis for Denial of the Motion to Strike.*

In its cross-appeal, Dr. Bronner argues the trial court erred in concluding that the statutory "commercial activity" exception in the anti-SLAPP legislation (§ 425.17, subd. (c)) was inapplicable. In 2003, the Legislature enacted section 425.17 to curb "disturbing abuse" of the anti-SLAPP statute.[23] (§ 425.17, subd. (a).) Section 425.17 provides two exceptions to the anti-SLAPP statute, under subdivision (b) and subdivision (c). Dr. Bronner argues that subdivision (c) bars OASIS's motion to strike. That section provides: "Section 425.16 does not apply to any cause of action brought against *a person primarily engaged in the business of selling or leasing goods or services*, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer, or the statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation, except where the statement or conduct was made by a telephone corporation in the course of a proceeding before the California Public Utilities Commission and is the subject of a lawsuit brought by a competitor, notwithstanding that the conduct or statement concerns an important public issue." (Italics added.)

We review the question of whether section 425.17 is applicable under the circumstances presented here under the same independent standard of review we applied to OASIS's appeal. (See *Navarro v. IHOP Properties, Inc., supra*, 134 Cal.App.4th at pp. 839, 840–841.) Furthermore, the question before us is one of statutory construction, which poses a question of law.

---

[23] The legislative history of section 425.17 establishes that corporations were the principal source of the "disturbing abuse" of the anti-SLAPP law cited in subdivision (a). (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, pp. 6–7; accord, *Metcalf v. U-Haul International, Inc.* (2004) 118 Cal.App.4th 1261, 1267 [13 Cal.Rptr.3d 686] [Legislature enacted § 425.17 to address abuse of the anti-SLAPP statute by commercial defendants who invoked its procedural protections with claims that "their advertising impacted the public interest . . ."].) The legislative history also states that Senate Bill No. 515 was intended to "correct" *DuPont, supra*, 78 Cal.App.4th 562. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 8.)

(*R & P Capital Resources, Inc. v. California State Lottery* (1995) 31 Cal.App.4th 1033, 1036 [37 Cal.Rptr.2d 436].) "Our primary task in construing a statute is to determine the Legislature's intent. [Citation.] Where possible, 'we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . . .' [Citation.]" (*Jarrow Formulas, Inc. v. LaMarche, supra*, 31 Cal.4th at p. 733, original ellipsis.) Generally, exceptions to a statute are construed narrowly to cover "only those circumstances which are within the words and reason of the exception." (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 20 [22 Cal.Rptr.2d 229]; see also *Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 316 [86 Cal.Rptr.3d 288, 196 P.3d 1094] (*Club Members*).) " 'The literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole.' [Citation.]" (*In re Enrique Z.* (1994) 30 Cal.App.4th 464, 469 [36 Cal.Rptr.2d 132].)

### 1. *Plain language of section 425.17, subdivision (c)*

The parties disagree about whether OASIS is "a person primarily engaged in the business of selling or leasing goods or services" under section 425.17, subdivision (c). The trial court determined that it was not. It is undisputed that OASIS's members are in the business of selling goods and that OASIS, as a nonprofit trade association, acts on its members' behalf. As the trial court observed, whether section 425.17, subdivision (c) applies to such an organization is a question of first impression.[24] We conclude that the plain language of subdivision (c) makes clear that the exception does not apply here.

---

[24] Division One of this court did not address this question in *Stewart, supra*, 181 Cal.App.4th at pages 675–677. In *Stewart*, the plaintiff musicians objected to the use of their names in an editorial feature that appeared in a gatefold layout, consisting of four pages advertising Camel cigarettes and five editorial pages that contained a graphical representation of the "universe" of indie rock bands. (*Id.* at pp. 670–673.) The musicians sued Rolling Stone magazine and R.J. Reynolds Tobacco Company, alleging that defendants " 'used the artist names . . . knowingly and deliberately for the commercial purpose of advertising Camel cigarettes' without their prior authorization." (*Id.* at pp. 670–671, 674.) Rolling Stone filed an anti-SLAPP motion that was denied. (*Id.* at p. 674.) The reviewing court rejected the plaintiffs' argument that section 425.17, subdivision (c), applied. The court observed: "It is true that defendants are 'primarily engaged in the business of selling goods,' however, as plaintiffs concede, the goods they sell are copies of Rolling Stone magazine, not Camel cigarettes. More significantly, the statement or conduct at issue here did not consist of 'representations of fact about the business operations, goods or services' of Rolling Stone or of any of defendants' business competitors. Instead, the representation at the center of this lawsuit is the representation that plaintiffs and their fellow musicians endorse the sale and use of Camel cigarettes." (181 Cal.App.4th at p. 676.) The plaintiffs did not argue that Rolling Stone was engaged in the business of selling Camel cigarettes on Camel's behalf. (*Ibid.*)

The exception, provided in section 425.17, subdivision (c), is limited, in relevant part, to "any cause of action brought against *a person primarily engaged in the business of selling or leasing goods or services*, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct *by that person* . . . ." (Italics added.) Thus, the plain language makes clear that the speaker must be "a person primarily engaged in the business of selling or leasing goods or services . . . ." (§ 425.17, subd. (c).) The Timmons declaration specifically provides: "OASIS does not produce or manufacture any cosmetic or personal care products. OASIS has no intention to produce or manufacture any products. OASIS does not engage, and does not intend to engage in the future, in the business of selling or leasing goods or services."[25] The allegations of Dr. Bronner's FAC are not inconsistent. Although Dr. Bronner alleges that the "OASIS Organic" standard's development has been "promoted principally by Defendant [Estée] Lauder," the FAC is nonetheless clear that it is Dr. Bronner's competitors' products, not OASIS's, that will be sold under the "OASIS Organic" seal.

Dr. Bronner's position would require that we read section 425.17, subdivision (c) as also applying to "someone acting on behalf of" a person primarily engaged in the business of selling or leasing goods or services. Had the Legislature so intended, it easily could have said so.[26] It did not. "When interpreting statutes, 'we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . . . "This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed." ' [Citation.]" (*Equilon, supra*, 29 Cal.4th at p. 59, original ellipsis.)

The Legislature clearly understood how to broaden the application of section 425.17. In subdivision (c)(2), for example, the statute provides: "The intended audience is an actual or potential buyer or customer, *or a*

---

[25] OASIS also argues that, because it plans to register the "OASIS Organic" seal as a certification mark, it would be forbidden from using the "OASIS Organic" seal on its own products. A certification mark may be cancelled if the owner produces or markets goods to which the mark is applied, permits use of the mark for purposes other than to certify, or discriminately refuses to certify the goods of any person who maintains the standard the mark signifies. (15 U.S.C. § 1064(5); *State of Idaho Potato v. G & T Terminal Pack.* (9th Cir. 2005) 425 F.3d 708, 716.) As noted above, we base our decision on the record before the trial court.

[26] We need not address Dr. Bronner's new theory that OASIS is primarily engaged in the business of selling its certification services to its member companies and that the challenged statements were "made in the course of delivering [OASIS's] . . . services." (§ 425.17, subd. (c)(1).) Dr. Bronner did not raise this argument before the trial court and has forfeited the right to raise it on appeal. We also reject Dr. Bronner's unsupported argument that "[o]nce OASIS authorizes . . . the members of its trade group to use its registered certification mark on a product label . . . OASIS adopts those goods as its own within the meaning of section 425.17[, subdivision ](c)(1)."

*person likely to repeat the statement to, or otherwise influence*, an actual or potential buyer or customer . . . ." (Italics added.) The absence of similarly inclusive language in subdivision (c) is an indication that the Legislature did not intend the exception to apply to persons acting on behalf of "a person primarily engaged in the business of selling or leasing goods or services . . . ." (See *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 283 [46 Cal.Rptr.3d 638, 139 P.3d 30].) ▮ " 'It is a settled rule of statutory construction that where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes.' " (*In re Jennings* (2004) 34 Cal.4th 254, 273 [17 Cal.Rptr.3d 645, 95 P.3d 906].)

Accordingly, we agree with the trial court's conclusion that "OASIS does not fall under section 425.17[, subdivision] (c) because OASIS . . . is not itself 'a person primarily engaged in the business of selling or leasing goods or services.' "

### 2. *Legislative history*

▮ When "legislative intent is expressed in unambiguous terms, we must treat the statutory language as conclusive; 'no resort to extrinsic aids is necessary or proper.' [Citation.]" (*Equilon, supra*, 29 Cal.4th at p. 61.) Here, however, the legislative history of section 425.17 supports our conclusion.

The legislative history shows that the Legislature explicitly considered and rejected an exception that would have applied to an entity merely "involved in the stream of commerce." (Sen. Amend. to Sen. Bill No. 1651 (2001–2002 Reg. Sess.) May 21, 2002.) In 2003, section 425.17 was enacted by Senate Bill No. 515 (2003–2004 Reg. Sess.). (Stats. 2003, ch. 338, § 1.) However, reform of the anti-SLAPP statute was originally proposed in Senate Bill No. 1651 (2001–2002 Reg. Sess.), which later became Senate Bill No. 789 (2001–2002 Reg. Sess.).[27] (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 789 (2001–2002 Reg. Sess.) as amended Aug. 26, 2002, p. 1; Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended July 8, 2003, p. 5.)

These earlier bills originally proposed language that differs significantly from that ultimately enacted by Senate Bill No. 515 (2003–2004 Reg. Sess.).

---

[27] Senate Bill No. 789 (2001–2002 Reg. Sess.) was vetoed by the Governor on September 30, 2002. (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended July 8, 2003, p. 5.) Despite the Governor's veto, the relevant language of Senate Bill No. 789 was revived in Senate Bill No. 515. (Assem. Amend. to Sen. Bill No. 789 (2001–2002 Reg. Sess.) Aug. 26, 2002; § 425.17, subd. (c).)

(Compare Stats. 2003, ch. 338, § 1 with Assem. Amend. to Sen. Bill No. 789 (2001–2002 Reg. Sess.) Aug. 15, 2002, and Sen. Amend. to Sen. Bill No. 1651 (2001–2002 Reg. Sess.) May 21, 2002.) For example, Senate Bill No. 1651 proposed, in relevant part: "(d)(1) [Section 425.16] does not apply to any of the following: [¶] . . . [¶] (B) Any cause of action against any manufacturer, wholesaler, retailer, *or other entity involved in the stream of commerce*, arising from any statement, representation, conduct, label, advertising, or other communication, made in regard to the product, services, or business operations of that person or entity, or any competitor." (Sen. Amend. to Sen. Bill No. 1651 (2001–2002 Reg. Sess.) May 21, 2002, italics added; accord, Assem. Amend. to Sen. Bill No. 789 (2001–2002 Reg. Sess.) Aug. 15, 2002.) Had the Legislature intended that speech by someone merely involved in the stream of commerce be subject to the exception, it would not have revised the originally proposed statutory language.

We also reject Dr. Bronner's argument that the legislative history makes clear that the Legislature intended to exclude from the anti-SLAPP procedure *all* causes of action targeting commercial speech, as defined by *Kasky, supra,* 27 Cal.4th 939. When Senate Bill No. 789 (2001–2002 Reg. Sess.) was amended, on August 26, 2002, the relevant language now found in section 425.17, subdivision (c) first appeared. (Assem. Amend. to Sen. Bill No. 789 (2001–2002 Reg. Sess.) Aug. 26, 2002.) The legislative history provides the following comments on the amendment: "[B]efore the author's recent amendments, opponents raised concerns regarding the impact of this bill on the free speech rights of businesses. While these concerns may still be expressed, the bill now closely tracks the constitutional principles governing regulation of commercial speech in its exception from the anti-SLAPP motion for causes of action against businesses based on the specified statements and conduct." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 789 (2001–2002 Reg. Sess.) as amended Aug. 26, 2002, p. 6; see also Assem. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003, p. 8.)

The legislative history quotes from *Kasky*: " '[W]hen a court must decide whether particular speech may be subjected to laws aimed at preventing false advertising or other forms of commercial deception, categorizing a particular statement as commercial or noncommercial speech requires consideration of three elements: the speaker, the intended audience, and the content of the message. [¶] In typical commercial speech cases, the speaker is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—*or someone acting on behalf of a person so engaged,* and the intended audience is likely to be actual or potential buyers or customers of the speaker's goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or

potential buyers or customers. [¶] Finally, the factual content of the message should be commercial in character. In the context of regulation of false or misleading advertising, this typically means that the speech consists of representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services.' " (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 789 (2001–2002 Reg. Sess.) as amended Aug. 26, 2002, p. 8, paragraph format omissions & italics added [quoting *Kasky, supra,* 27 Cal.4th at pp. 960–961]; accord, Assem. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003, pp. 9–10; Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 10 ["SB 515 indeed borrows from the *Kasky v. Nike* formulation of commercial speech . . . ." (italics added)].)

After citation to *Kasky,* the analysis continues: "Rather than carve out specific statutory causes of action, as the bill once proposed, *and in response to concerns raised about the scope of the prior language,* the author has amended the bill to closely track Kasky's guidelines on commercial speech, focusing on the speaker, content of the message, and the intended audience. [¶] Specifically, the bill would exempt from the anti-SLAPP motion *only* causes of action where the speaker is a person primarily engaged in the business of selling or leasing goods or service. The content of the covered speech under the bill is representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. Finally, the bill also considers the intended-audience element of the Kasky test. Under the bill, the intended audience must be an actual or potential buyer or customer, *or a person likely to repeat the statement to or otherwise influence an actual or potential buyer or customer,* or the statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 789 (2001–2002 Reg. Sess.) as amended Aug. 26, 2002, pp. 8–9, italics added.) An almost identical discussion exists in the legislative history of Senate Bill No. 515 (2003–2004 Reg. Sess.). (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003, pp. 10–11.)

■ Rather than suggesting an intent to adopt the *Kasky* test in toto, it appears that the Legislature only intended to "closely track" *Kasky's* guidelines. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 789 (2001–2002

Reg. Sess.) as amended Aug. 26, 2002, pp. 8–9; see Assem. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003, p. 10.) It is significant that the Legislature adopted *Kasky*'s expansive language on the intended audience prong, but did not adopt similarly expansive language with respect to the speaker requirement, despite having *Kasky*'s text before it. Our Legislature apparently determined the statute's requirements to be appropriate, finding it unnecessary to add the "someone acting on behalf of" language that Dr. Bronner proposes. We cannot second-guess the Legislature's policy judgment.

█ Other aspects of the legislative history of Senate Bill No. 515 (2003–2004 Reg. Sess.) are consistent with our view that only a subset of commercial speech was intended to be covered by section 425.17, subdivision (c). (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended July 8, 2003, pp. 1–2 [bill would make anti-SLAPP statute inapplicable to "lawsuits brought against a business that arises from commercial statements or conduct of that business, *as specified*" (italics added)]; Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 1 [same]; Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 515 (2003–2004) as amended July 8, 2003, p. 3 ["even if this bill excludes *some commercial speech* from the anti-SLAPP motion, there is a countervailing governmental interest . . ." (italics added)]; but see Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 8 ["SB 515 would make SLAPP motion inapplicable to cases against a business where cause of action arises from the business's commercial speech or activity" (underscoring omitted)].) Accordingly, we agree with OASIS that the better understanding of section 425.17, subdivision (c), is that all of the speech exempted from the anti-SLAPP statute is commercial speech, but not all commercial speech is exempted thereunder. (See Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, pp. 11–12 ["Section 425.17(c) would exempt lawsuits based on defendant's acts that would be categorized as commercial speech . . ." by providing that anti-SLAPP procedure is "not applicable to *the specified type of commercial speech*" (italics added)].)

█ Our conclusion is not inconsistent with the Second Appellate District's recent statement that "the legislative history of the commercial speech exemption to the anti-SLAPP statute confirms the Legislature's intent to except from anti-SLAPP coverage disputes that are purely commercial." (*Taheri Law Group v. Evans* (2008) 160 Cal.App.4th 482, 491 [72 Cal.Rptr.3d 847]

(*Taheri*); accord, *Brill Media Co., LLC v. TCW Group, Inc.* (2005) 132 Cal.App.4th 324, 342 [33 Cal.Rptr.3d 371] (*Brill Media*) [§ 425.17 "was intended to apply to commercial disputes"].) Neither of these cases considered the issue presented here or suggested that *all* commercial speech is exempt from the anti-SLAPP statute by section 425.17, subdivision (c).[28] (*Taheri*, at pp. 491–492; *Brill Media*, at pp. 340–342.) "A decision, of course, does not stand for a proposition not considered by the court. [Citation.]" (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 343 [14 Cal.Rptr.3d 857, 92 P.3d 350].)

### 3. *No published authority conflicts with our interpretation*

Dr. Bronner has not brought to our attention any reported case, interpreting section 425.17, that involved representations made by a person who does not himself sell goods or services on behalf of another who does. (*Club Members, supra*, 45 Cal.4th at p. 316 [addressing § 425.17, subd. (b)]; *Taheri, supra*, 160 Cal.App.4th at p. 490 ["a lawyer may be said to be 'primarily engaged in the business of selling or leasing goods or services' . . ."]; *Brill Media, supra*, 132 Cal.App.4th 324, 340–341;[29] *Physicians Com. for Responsible Medicine v. Tyson Foods, Inc.* (2004) 119 Cal.App.4th 120, 123, 127–128 [13 Cal.Rptr.3d 926] [involving world's largest poultry producer's speech about own products]; *Sharper Image Corp. v. Target Corp.* (N.D.Cal. 2006) 425 F.Supp.2d 1056, 1060–1061, 1075–1076 [involving manufacturer of air purifier's speech about competitor's air purifier].)

For the foregoing reasons, we conclude that OASIS is not "a person primarily engaged in the business of selling or leasing goods or services," and

---

[28] In fact, *Taheri, supra*, 160 Cal.App.4th 482, determined that a lawyer's speech that could be characterized as both commercial speech and as legal advice was not exempt from the anti-SLAPP statute under section 425.17, subdivision (c). (*Taheri*, at p. 492.) Thus, the *Taheri* court interpreted the exception more narrowly than a literal application of the statutory language would allow. (*Id.* at pp. 490–491.) *Taheri* does not support Dr. Bronner's suggestion that we ignore the plain language to give the statute a broader application. In fact, as an exception to the anti-SLAPP statute, subdivision (c) of section 425.17 must be narrowly interpreted. (*Club Members, supra*, 45 Cal.4th at p. 319.)

[29] Dr. Bronner makes much of the fact that the *Brill Media* court observed: "Defendants fit into two categories. The first set of defendants own the bonds issued by [the plaintiffs]. The second set of defendants include related companies including subsidiaries, general partners, asset advisers and managers, and other entities of the bondholders." (*Brill Media, supra*, 132 Cal.App.4th at p. 332.) However, in determining whether section 425.17, subdivision (c) applied, the court noted that all "[d]efendants are large financial management and services conglomerates involved in the purchase and sale of financial instruments and investing in companies." (132 Cal.App.4th at p. 341.) There is absolutely no indication that any defendant was not " 'primarily engaged in the business of selling [financial management] services,' " as required by section 425.17, subdivision (c). (132 Cal.App.4th at pp. 340–341.)

the speaker requirement of section 425.17, subdivision (c) is not met here. We do not address the requirements of section 425.17, subdivision (c)(1) or (2).

### III. Disposition

The order denying the special motion to strike is affirmed. Dr. Bronner's cross-appeal is denied. Dr. Bronner is to recover its costs on appeal.

Jones, P. J., concurred.

**SIMONS, J.,** Dissenting.—The trial court rejected the motion to strike (Code Civ. Proc., § 425.16)[1] of appellant Organic and Sustainable Industry Standards, Inc. (OASIS), under the first prong of the anti-SLAPP[2] statute's two-prong analysis. Because I believe the trial court erred in concluding that OASIS's role in the certification process is not conduct "in furtherance of [OASIS's] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" (§ 425.16, subd. (b)(1)), I respectfully dissent.

I. *Formulation of the OASIS Organic Standard Is Speech in Connection with a Public Issue*

As the majority postulates, OASIS's effort to formulate a definition of "organic" for personal care products is distinct from the certification process. (Maj. opn., *ante*, at p. 1200.) That process will occur following determination of the "OASIS organic standard" and will entail OASIS authorizing a third party certification agent to determine if a particular product satisfies the OASIS organic standard; if so, that product may be imprinted with the "OASIS Organic" seal. Because OASIS contends its role in the *certification* process is "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest"[3] (§ 425.16, subd. (e)(4)), it is appropriate to examine whether the *formulation* of a standard for organic is an exercise of the right of free speech on an issue of public interest.

There is little dispute that the formulation of a standard for organic personal care products is protected speech. The majority appears to acknowledge this (maj. opn., *ante*, at pp. 1200, 1202–1203, 1205) and respondent

---

[1] All further undesignated section references are to the Code of Civil Procedure.

[2] SLAPP is an acronym for strategic lawsuit against public participation.

[3] For ease of reference, I refer to "public issue or an issue of public interest" as "issue of public interest." Although section 425.16, subdivision (e)(4), uses the terms "public issue" and "public interest" in the disjunctive, "there appears to be no substantive difference between them." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2009) ¶ 7:780, p. 7(II)-24 (rev. # 1, 2009).)

All One God Faith, Inc., doing business as Dr. Bronner's Magic Soaps (Dr. Bronner), seems to concede the point in its brief. In any event, the formulation of the standard is clearly speech on an issue of public interest, protected under the first prong of section 425.16. Consumer interest in organic products is currently high,[4] but no consensus exists on the definition of the term "organic." The federal government imposes mandatory standards for the marketing of organic food and agricultural products. But the USDA NOP, established under the Organic Foods Production Act of 1990 (7 U.S.C. § 6501 et seq.), provides only voluntary and permissive criteria for organic personal care products, like soaps and lotions.[5] According to the first amended complaint, the NOP standards regarding these products differ from the OASIS organic standard.

Whether the NOP standards are wise or should be further refined and whether they should remain voluntary are matters of public interest. By formulating an alternate standard, OASIS becomes a party to this controversy. In developing the standard, OASIS has released on its Web site to the public and the personal care industry more than a dozen draft standards, and has received "approximately 50 inquiries" from members of the public regarding the draft standards. The OASIS organic standard may influence not only the definition of organic as applied to personal care products, but it also may play a role in the federal government's decision whether to leave the NOP criteria voluntary or to encourage the development of further nongovernmental standards for organic personal care products. The formulation of the OASIS organic standard thus constitutes an exercise of OASIS's right to free speech in connection with an issue of public interest, as required by section 425.16, subdivision (b). (See *Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1347 [63 Cal.Rptr.3d 798] ["A statement or other conduct is . . . 'in connection with a public issue or an issue of public interest' ([§ 425.16, subd.] (e)(4)) if the statement or conduct concerns a topic of widespread public interest and contributes in some manner to a public discussion of the topic. [Citation.]"].)

---

[4] For example, exhibit H of OASIS's August 21, 2009 request for judicial notice shows that around 400 comments were received in response to notice of a May 2009 meeting of the National Organic Standards Board for the United States Department of Agriculture (USDA) National Organic Program (NOP), at which the board discussed whether to adapt the organic food standards to cosmetics.

[5] According to the first amended complaint, "The NOP criteria only govern personal care products that voluntarily represent or imply that they meet the NOP criteria or carry the USDA organic seal. The NOP regulations do not apply to personal care products that represent that they are organic but do not purport to comply with the NOP organic criteria and do not carry or imply that they carry the USDA organic seal."

## II. *OASIS's Role in the Certification Process Is Protected Conduct*

After the OASIS organic standard is finalized,[6] OASIS will authorize third party certification agents to determine if products comply with the standard. If so, OASIS will authorize the products' manufacturers to affix the OASIS Organic seal to their products. Dr. Bronner seeks to enjoin OASIS's role in this certification process.[7] After consideration of the purpose of certification marks, I address why OASIS's role in certifying a product should be protected under the first prong of the anti-SLAPP statute.

### A. *The Purpose of Certification Marks*

A "certification mark" is "any word, name, symbol, or device, or any combination thereof—[¶] (1) used by a person other than its owner, or [¶] (2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter, [¶] to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization." (15 U.S.C. § 1127.) The statute creates three types of certification marks, one of which, like the OASIS Organic seal, is designed to certify the quality of goods or services. "The mark certifies that the goods or services tested meet certain standards or conditions . . . ." (3 McCarthy on Trademarks and Unfair Competition (4th ed. 2009) § 19:91 (McCarthy).) "The owner of the certification mark sets its standards and then must, through advertising, convince buyers that the certification symbol provides reliable and useful information." (*Ibid.*)[8]

The Lanham Act (15 U.S.C. § 1051 et seq.) imposes several limitations on the use of certification marks. It includes an "anti-use" rule, prohibiting the owner of the certification mark from using it on its own products. (15 U.S.C.

---

[6] I do not mean to imply that the standard may not evolve over time.

[7] Though the United States Patent and Trademark Office has not yet issued a certification mark to OASIS, this case rests on the assumption that it will. For example, the opening paragraph of Dr. Bronner's brief in this court states: "OASIS will make its challenged statements by authorizing and indeed requiring its members to use, on product labels, OASIS' registered certification mark, which prominently features the word 'organic.' "

[8] Other certification marks designed to certify the quality of goods include the "UL" (Underwriters Laboratories) seal, which certifies compliance with safety standards (*Midwest Plastic v. Underwriters Laboratories* (Fed.Cir. 1990) 906 F.2d 1568, 1569), and the "Good Housekeeping" seal (*Jos. S. Cohen & Sons Co. v. Hearst Magazines* (C.C.P.A. 1955) 220 F.2d 763, 765).

§ 1064(5).) The primary reason for this rule is to avoid "compromis[ing] the objectivity of the certifier if it were competing in the market that it certified." (3 McCarthy, *supra*, § 19.94.) The statute also forbids the registrant from discrimination by refusing to certify the goods or services of any person who maintains the standards or conditions which the mark certifies. (15 U.S.C. § 1064(5).)

Certification marks play an important role in a competitive market by providing crucial product information. As explained in section 1306.01(b) of the United States Department of Commerce, Patent and Trademark Office, Trademark Manual of Examining Procedure (6th ed., Oct. 2009) (TMEP), "[t]he message conveyed by a certification mark is that the goods or services have been examined, tested, inspected, or in some way checked by a person who is not their producer, using methods determined by the certifier/owner. The placing of the mark on goods . . . thus constitutes a certification by someone other than the producer that the prescribed characteristics or qualifications of the certifier for those goods . . . have been met."[9] The certification mark serves to assure consumers that the products bearing the mark possess some characteristic common to the goods and services of *many* sellers or manufacturers. (See TMEP, § 1306.01(b) ["The purpose of a certification mark is to inform purchasers that the goods or services of a person possess certain characteristics or meet certain qualifications or standards established by another person."].) Consumers seek out this information "for example, by . . . relying upon the Good Housekeeping and Underwriters Laboratories seals of approval. This information saves buyers the trouble of investigating products themselves and the risk of trying untested products." (*Consolidated Metal Prod. v. Amer. Petro. Institute* (5th Cir. 1988) 846 F.2d 284, 296; see also *State of Idaho Potato v. G & T Terminal Pack.* (9th Cir. 2005) 425 F.3d 708, 716–717 [the Lanham Act's limitations on the use of certification marks "appear designed to promote free competition in the market for certified products" (fn. omitted)].)[10]

B. *Certification Marks Provide Consumer Protection Information,*
 *Entitling Them to Protection*

The parties have not cited any cases, and I have found none, that discuss whether authorizing the use of a certification mark is protected conduct under

---

[9] <http://tess2.uspto.gov/tmdb/tmep/1300.htm> (as of Apr. 13, 2010).

[10] The reliability of certification marks is reinforced by cases holding owners of marks legally responsible for the accuracy of their certifications: "One who sees such a certification mark on a product . . . is entitled to assume that the product or service in fact meets whatever standards of safety or quality have been set up and advertised by the certifier. If a consumer is injured by products certified by the owner of a certification mark, the consumer may have a tort cause of action against the product certifier." (3 McCarthy, *supra*, § 19:91; see also *id.*, §§ 18:74 to 18:78.)

section 425.16. Given the well-recognized and vital role played by these marks in informing consumers (TMEP, *supra*, § 1306.01(b)), such protection is warranted. *Carver v. Bonds* (2005) 135 Cal.App.4th 328 [37 Cal.Rptr.3d 480] (*Carver*) and *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883 [17 Cal.Rptr.3d 497] (*Wilbanks*) are instructive. In *Carver*, the plaintiff sued the Hearst Corporation and others for defamation and interference with prospective economic advantage based on statements in an article published in the San Francisco Chronicle. (*Carver*, at p. 332.) The article disclosed that the plaintiff, a podiatrist, had greatly exaggerated the extent of his work for different Bay Area sports teams and athletes and failed to disclose numerous claims of malpractice. (*Carver*, at pp. 343–344.) In *Wilbanks*, an insurance broker sued the defendant, who had published on her Web site critical comments about the broker and called him unethical. (*Wilbanks*, at pp. 889–890.) In both cases, the courts concluded the comments were discussions of issues of public interest. Although "[t]he statements did not relate to a public issue under commonly articulated criteria . . . ," "[t]he statements were nevertheless of public concern because they were 'consumer protection information . . . .' [Citation.]" (*Carver*, at p. 343, quoting *Wilbanks*, at pp. 899, 900.) The statements "were a warning not to use [the] plaintiffs' services. In the context of information ostensibly provided to aid consumers choosing among brokers, the statements, therefore, were directly connected to an issue of public concern." (*Wilbanks*, at p. 900, fn. omitted; see also *Carver*, at p. 343.)

Unlike the negative messages protected in *Carver* and *Wilbanks*, a certification mark conveys a positive message: a party independent of the producer certifies that the product meets a particular standard. (See TMEP, *supra*, § 1306.01(b) [stating that the "message conveyed" by a mark is that the goods have been inspected and determined to satisfy the certifier's standard of quality].) This message should be protected by the anti-SLAPP statute. The majority concludes consumers do not care about the standards underlying product certifications. (Maj. opn., *ante*, at pp. 1204–1205, fn. 16.) But this argument proves too much. It challenges the underlying rationale for marks certifying quality: informing consumers that the product has certain characteristics. (TMEP, *supra*, § 1306.01(b).) The facts of this case underline the majority's error. If consumers interested in purchasing an organic soap see one product carrying a government-sanctioned USDA organic seal and a competitor's product carrying an OASIS Organic seal, why should this court assume consumers would have no interest in ascertaining what standard the OASIS Organic seal represents?

Because under the federal scheme the purpose of the OASIS certification mark is to provide useful consumer information,[11] those who disagree with the standard should be subject to the anti-SLAPP statute if they file suit against the owner of the certification mark for authorizing use of the mark.[12]

C. *The Certification Process Enhances the Current Debate Surrounding the Formulation of the OASIS Organic Standard and Promotes the Standard Itself, Entitling OASIS to Protection*

The OASIS Organic seal is deserving of the protection of the anti-SLAPP statute for another reason as well. In this case, the organic standard of quality represented by the OASIS mark is a matter of public interest, OASIS's formulation of the standard is an exercise of its free speech rights, and OASIS's role in the certification process is the conduct underlying Dr. Bronner's action against OASIS. Under subdivision (e)(4) of section 425.16, the issue is whether the certification process is *in furtherance of* OASIS's protected conduct in formulating its standard for organic personal care products. (See *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P.3d 695] ["[T]he defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech."].)

Although the anti-SLAPP statute does not define "in furtherance," the Second Appellate District in *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 166 [1 Cal.Rptr.3d 536] (*Lieberman*), adopted a dictionary definition, stating, "Furtherance means *helping* to advance, *assisting*." (First italics omitted.) This expansive definition is consistent with the requirement

---

[11] Of course, Dr. Bronner alleges the OASIS mark is false and misleading. However, the plaintiffs in *Carver* and *Wilbanks*, who sued the defendants for defamation, also alleged the statements at issue were false. As I will explain in part III. (*post*, at p. 1227), Dr. Bronner's allegations about the merits of the OASIS definition of organic are properly addressed in the second prong of the section 425.16 analysis.

[12] Under the majority's reasoning, the result would be no different were a comparable suit brought against the owners of the Good Housekeeping and UL certification marks. As in this case, those marks are applied by manufacturers to promote product sales, and the marks simply certify compliance with standards of quality that are undescribed on the marks themselves. Thus, if the majority's analysis is correct, it appears the owners of those marks would also lack the protection of the anti-SLAPP statute for their certifying activities, despite the well-recognized usefulness of those certification marks to consumers. The fact that the OASIS mark presently lacks the public recognition enjoyed by the Good Housekeeping and Underwriters Laboratories marks only emphasizes the importance of the certification process to public acceptance of the OASIS definition of organic personal care products, as well as acceptance of the certification mark itself. (See TMEP, *supra*, § 1306.05 [For approval of a mark, "It is not necessary to show that the mark is instantly recognizable as a certification mark, or that the mark has already become well known to the public as a certification mark. However, it should be clear from the record that the circumstances surrounding the use or promotion of the mark will give certification significance to the mark in the marketplace."].)

that the statute "shall be construed broadly." (§ 425.16, subd. (a).) The *Lieberman* court concluded that a television station's use of surreptitious recordings in gathering information for use in a broadcast news report was conduct in furtherance of the news media's exercise of its free speech rights. (*Lieberman*, at p. 166.)

For two related reasons, the OASIS certification process satisfies the *Lieberman* definition of "in furtherance." OASIS is currently formulating a definition of organic for personal care products. Logically, interest in that formulation is materially enhanced by the fact that this standard will be "attached" to certain products through use of the OASIS Organic seal. The cost and effort undertaken to lobby OASIS on its standard or, for that matter, to pursue this lawsuit, may be substantial. If the standard, once finalized, were to be relegated to a single press release or even permanent placement on the OASIS Web site, it would generate far less attention among consumers, and, therefore, those who wish to influence them. In sum, the future act, certifying that certain products achieve a specific standard, promotes interest and participation in the earlier debate over what that standard should be.

Further, the certification process creates ongoing interest in the standard. That is, in addition to promoting sales of a product, affixing the OASIS Organic seal to that product promotes the *standard* and generates interest in *its* content. (See 3 McCarthy, *supra*, § 19:91 [noting that the owner of the mark must promote it to convince consumers of the reliability and utility of the mark].) As discussed above, use of the OASIS Organic seal will generate significantly more consumer interest in OASIS's definition of organic than the definition would receive were it relegated to OASIS's Web site.[13]

Dr. Bronner asserts that California appellate cases have consistently held that "promotional statements on product labels and in advertising that are designed to sell products . . . are not speech 'in connection with a public

---

[13] The majority states that it is "not necessary" for OASIS to authorize use of a certification mark to express its views on what constitutes an organic product because "that goal will otherwise be achieved by the articulation of the standard . . . ." (Maj. opn., *ante*, at p. 1205.) However, section 425.16, subdivision (e)(4), brings within the statutory scheme *all* conduct in furtherance of speech on an issue of public interest. Nothing suggests the Legislature intended courts to protect only such conduct deemed "necessary" for the speaker to express his or her view. Thus, the majority's approach is contrary to the plain language of the statute. The majority's approach is also at odds with the well-established proposition that the right to free speech includes the right to choose the means of expression; "[v]arious means of expression are not fungible." (*Gonzales v. Superior Court* (1986) 180 Cal.App.3d 1116, 1127 [226 Cal.Rptr. 164]; see also, e.g., *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 880 [138 L.Ed.2d 874, 117 S.Ct. 2329]; *City of National City v. Wiener* (1992) 3 Cal.4th 832, 848, fn. 11 [12 Cal.Rptr.2d 701, 838 P.2d 223].) In this case, OASIS reasonably could have concluded that the certification process would be a particularly effective way to achieve widespread public acceptance of its standard.

issue or an issue of public interest' within the meaning of the anti-SLAPP statute." But in addition to promoting a product, the OASIS Organic seal advocates for the OASIS organic *standard*, distinguishing this case from those cited by Dr. Bronner.[14]

In *Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404 [9 Cal.Rptr.3d 242] (*Scott*), a woman who suffered a stroke after using the defendant's product, Metabolife 356, sued for personal injury and false advertising. The advertising consisted of misleading statements by the manufacturer regarding the product's safety and efficacy. (*Id.* at p. 408.) The Court of Appeal held that "a manufacturer's advertising of a specific consumer product, on its labels, and to the public, for the purpose of selling that product—is not an issue of public interest . . . as that phrase is used in section 425.16." (*Id.* at p. 420, fn. omitted.) Because the false advertising did not address "obesity or weight management in general," section 425.16 did not apply. (*Scott*, at p. 423.)

In *Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39 [134 Cal.Rptr.2d 420] (*Nagel*), the court rejected an anti-SLAPP motion directed at an unfair competition lawsuit brought against the manufacturer of an ephedrine-containing herbal supplement. (*Id.* at pp. 42–43.) The plaintiff claimed the manufacturer had falsely placed on the label a statement that the product was " 'standardized for 6% ephedrine.' " (*Id.* at p. 44.) The court concluded, "[h]ere, the list of Ripped Fuel's ingredients on the bottle labels and on Twin Labs' Web site was not participation in the public dialogue on weight management issues; the labeling on its face was designed to further Twin Labs' private interest of increasing sales for its products. [Citation.] Twin Labs' commercial speech was not made 'in connection with a public issue' as that phrase is used in section 425.16." (*Id.* at pp. 47–48.)

Finally in *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 598–599 [132 Cal.Rptr.2d 191] (*Consumer Justice Center*), the plaintiff sued the manufacturer of the product Grobust, which claimed its product offered " 'The All-Natural Way To A Fuller, More Beautiful Bust!' " The plaintiff alleged that and other statements were false and misleading, in violation of the Consumers Legal Remedies Act (Civ. Code, § 1770, subd. (a)(5)) and the unfair competition law (Bus. & Prof. Code,

---

[14] The fact that the certification is arguably commercial speech does not dictate the result in this case. While section 425.17, subdivision (c), excludes certain types of commercial speech from the scope of section 425.16 (but not the speech in this case, as the majority concludes [maj. opn., *ante*, at pp. 1218–1219]), Dr. Bronner has presented no authority that commercial speech is otherwise categorically excluded from the protection of the anti-SLAPP statute. (See *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 678 [105 Cal.Rptr.3d 98].) Neither does the majority cite any such authority, despite its emphasis on the commercial purposes served by the certification process. (Maj. opn., *ante*, at pp. 1205–1210.)

§ 17200 et seq.). (*Consumer Justice Center*, at p. 599.) In rejecting the defendant's argument that " 'herbal dietary supplements' " are a matter of public interest, the court pointed out that the statements underlying the lawsuit were not about herbal medicine in general, but rather about the specific properties and benefits of a specific product. (*Id.* at p. 601.) The court concluded that the manufacturer's claims about Grobust were not a matter of public interest. (*Ibid.*)

Dr. Bronner's reliance on these particular cases reflects a fundamental misunderstanding of the role played by certification marks, like the one at issue here. The OASIS Organic seal, applied only after approval by an independent inspector, provides useful consumer information and promotes the OASIS definition of organic, a topic of substantial public interest. A manufacturer's act of placing information on a label touting its own product is typically for the purpose of marketing the product and not in furtherance of the manufacturer's speech on a larger issue of public interest. In contrast, OASIS's interest is in public acceptance of its standard, not the sale of any particular product. For these reasons, *Scott, Nagel*, and *Consumer Justice Center* are inapposite.[15]

## III. Conclusion

In this case, Dr. Bronner contends the OASIS Organic seal will constitute a false and misleading representation that the contents of the products to which it is affixed are organic. Dr. Bronner alleges the OASIS organic standard is contrary to reasonable consumer expectations that, for example, organic personal care products do not contain any petrochemicals, synthetic preservatives, or cleansing agents derived from conventionally produced agricultural materials. A conclusion that OASIS's role in the certification process is protected under the anti-SLAPP statute would not immunize OASIS from liability for any false or misleading aspects of its certification mark. (See *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 953 [119 Cal.Rptr.2d 296, 45 P.3d 243] ["commercial speech that is false or misleading is not entitled to First Amendment protection and 'may be prohibited entirely' "].) Instead, Dr. Bronner's allegations are relevant only to the second prong of the anti-SLAPP statute's analysis, which considers whether the plaintiff has shown a probability of prevailing. (See *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305 [106 Cal.Rptr.2d 906] ["The problem with [the plaintiff's] argument is that it confuses the threshold question of whether the SLAPP statute applies with the question whether [the plaintiff] has established a probability of success on the merits."].) If

---

[15] We are not confronted in this appeal with the question of whether a *manufacturer's* act of applying the OASIS Organic seal to a product would constitute protected conduct under section 425.16.

Dr. Bronner is able to establish a probability of prevailing on its claim that application of the OASIS Organic seal will violate the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), it will prevail. I would reverse and remand for the purpose of allowing the trial court to consider that second prong under section 425.16.

The petition of appellant All One God Faith, Inc., for review by the Supreme Court was denied July 28, 2010, S182848. George, C. J., did not participate therein. Corrigan, J., was of the opinion that the petition should be granted.